[Crim. No. 13550. Second Dist., Div. Five. Aug. 30, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM R. LILLIOCK, Defendant and Appellant.

*Assigned by the Chairman of the Judicial Council.

Bernard A. Leckie, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Plaintiff and Respondent.

AISO, J. pro tem.*—Defendant, William R. Lilliock, appeals from a judgment sentencing him to state prison pronounced upon a jury verdict finding him guilty of a murder of the second degree, after his motion for new trial was denied. (Pen. Code, §§ 187, 189, 190.)

We have for review the second trial against the defendant for murder. On the first trial, he was tried jointly with his codefendant, Oliver Stanley Williams, and convicted of a first degree murder. The judgment imposing a life sentence upon him was reversed upon appeal on the sole ground that his confessions obtained in violation of his rights under *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], had been received erroneously into evidence. (*People* v. *Lilliock* (1965) 62 Cal.2d 618 [43 Cal.Rptr. 699, 401 P.2d 4].) Upon this retrial, defendant was tried separately from codefendant Williams. Williams was again found guilty of murder of the first degree and sentenced to death. His appeal is still pending.

---

*Assigned by the Chairman of the Judicial Council.

## Contentions on Appeal

Defendant contends that his judgment of conviction should be reversed because of the following errors or violations of his constitutional rights: (1) denial of his right to speedy trial and expeditious appellate review; (2) nonappointment of counsel for him at the time of his police lineup; (3) refusal of the trial court to compel codefendant Williams, called as a witness by defendant, to testify; (4) use of defendant's testimony given during the penalty phase of his first trial to impeach him on retrial; (5) admission of inflammatory pictures of the deceased victim; (6) insufficiency of the evidence to support the conviction for second degree murder; and (7) four assignments of error urged personally by the defendant.

In addition to these issues, we asked for supplemental briefs upon the question whether it is proper to give felony-murder instructions where the information discloses that the felonies, other than murder, are barred by the statute of limitations.

We have considered the foregoing contentions in light of the record and the applicable rules of law. While the evidence would be sufficient to support the judgment of conviction, absent a violation of defendant's federally protected constitutional rights and errors in the instructions to the jury, a reversal is compelled by *Harrison* v. *United States* (1968) 392 U.S. 219 [20 L.Ed.2d 1047, 88 S.Ct. 2008]; *Chapman* v. *California* (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824]; and *People* v. *Polk* (1965) 63 Cal.2d 443, 449-450 [47 Cal.Rptr. 1, 406 P.2d 641]. Because of this conclusion, we shall discuss only the issues relevant to our decision and those which might arise upon a further retrial.

## The Factual Background

In view of the disposition we make of this appeal, it is unnecessary to relate the evidentiary facts in detail. Viewing the evidence in the light most favorable to the People (*People* v. *Combes* (1961) 56 Cal.2d 135, 139 [14 Cal.Rptr. 4, 363 P.2d 4]), the facts are:

On October 28, 1962, Arthur Kretchman, the deceased victim, resided in a cottage (a small kitchen, bedroom and bathroom) at a motel near downtown Los Angeles. Sometime after leaving a bar in downtown Los Angeles at about 8 p.m., defendant and Williams, in Kretchman's absence, climbed through a kitchen window of the cottage and ransacked it. Defendant searched through Kretchman's suitcase, among

other things. He also searched through the refrigerator and cupboard in the kitchen and with Williams drank some beer found in the cottage.

When Kretchman returned, carrying a bag of groceries, Williams jumped him as he came through the kitchen door, wrestled him to the floor, and proceeded to generally beat him up. Defendant assisted in tying Kretchman up. The sounds of the thumping, falling, thrashing around, and Kretchman's moaning, groaning, and "calling type" noise were sufficiently loud to attract the attention of his neighbors, Alison and Leipleim, who lived in the cottages flanking Kretchman's on both sides.

They approached Kretchman's cottage to investigate. The defendant was then standing on the small porch or stoop of Kretchman's cottage. Alison, in Leipleim's presence and hearing, asked defendant if Kretchman were not hurt. Defendant falsely replied that Kretchman was "stoned" (dead drunk), that he was violent when drunk, that defendant was his nephew, that he would stay all night and look after Kretchman so that Kretchman would not further disturb the neighbors. Upon this false assurance, Alison and Leipleim returned to their respective dwellings. Leipleim observed defendant reenter the Kretchman cottage, using a key to unlock the door.

About five minutes later, Alison heard a car start up. He looked out his window and saw Kretchman's car being driven away in a jerky manner, its lights out, and with two people in it. Leipleim saw that Williams was behind the wheel and defendant in the passenger seat.

Either Williams or defendant had taken Kretchman's keys from him. At any rate, defendant had the keys as they left Kretchman's cottage and headed for Kretchman's car parked across the street. Defendant tried to start the car, but was unable to do so. Williams took over at defendant's request.

Alison fetched the manager, Mrs. Fish, who opened the door to Kretchman's cottage. The lights would not turn on. The bulbs had been taken out of their sockets and left in a pan of water in the kitchen sink. Using flashlights, they found Kretchman lying on the floor, tied and gagged, and apparently dead. Groceries and his dentures were strewn on the floor around him. His pants pockets had been turned inside out. They left everything untouched and immediately summoned the police, who arrived around 10:50 p.m.

After driving off in Kretchman's car, defendant and Wil-

liams stopped to pick up Williams's suitcase and headed out of state, stopping later for gasoline and coffee. As the result of an all-points, police radio bulletin, the defendant, Williams, and a hitchhiker whom they had picked up were apprehended by the California Highway Patrol during the early morning hours of October 29, 1962, at a roadblock 25 miles west of Needles and approximately 265 miles from Los Angeles. They were in Kretchman's car. Defendant was then driving.

The confessions obtained by the Los Angeles police officers at the Needles sheriff's office on the date of arrest and the day following were ruled illegal upon the appeal from the first judgment of conviction. They, therefore, were not offered upon the retrial.

The coroner's pathologist, Dr. Noguchi, who conducted an autopsy on Kretchman at about 11 a.m., on October 29, 1962, found three bruises: on the left side of Kretchman's neck, on his left eyelids, and temple; swelling of the right cheek and left temple; a fracture of the thyroid cartilage; and extensive hemorrhage of the muscles in the front of the neck, the scalp, and the cranial cavity. He ascribed the cause of death as being asphyxia due to strangulation of the neck and constrictive forces applied thereto and maintained for a certain duration of time.

Other evidentiary facts will be noted at points germane to the consideration of the various issues which we hereafter discuss.

*Admission of Defendant's Statement Made in Prior Penalty Trial Constituted Reversible Error*

Defendant contends that the use of his testimony given during the penalty phase of his first trial for impeaching him on this retrial constituted reversible error.

Upon direct examination by his counsel, defendant testified that after talking to the neighbor Alison on the small porch or stoop, he never reentered the cottage, because about that time Williams "came running out and he handed me some car keys and he said, 'Let's get out of here,' so I said, 'What are these keys for?' He said, 'The car is sitting right across the street.' So I took the car keys."

Upon cross-examination, over defense objection that the statement being the "fruit of a poisoned tree," it was inadmissible to impeach the defendant, the prosecution was permitted to elicit the following reference to defendant's testimony given on the penalty phase of the first trial.

"Q. [Prosecutor] : Mr. Lilliock, again I call your attention to page 254 of this transcript, and directing your attention to lines 23 and 24, I will ask you to read those.

"A. [Defendant] I have.

"Q. [Prosecutor] The question was: 'Q. What did you do then? A. I got in his coat pockets and got his car keys. I got the key and ran out the door.' Was that question asked of you and was that answer given by you?

"A. [Defendant] Well, I don't remember but I guess it was, if it is on the record."

The admission of the foregoing statement constituted error. In reversing the conviction upon the first trial, our Supreme Court stated that the illegal statements of Lilliock introduced upon the guilt phase of the earlier trial were admissions "constituting burglary and robbery, and Kretchman was killed in the perpetration of these felonies." "Because of the felony murder rule, however, defendants' statements amounted to confessions of first degree murder (see Pen. Code, § 189), and the use in evidence of such statements obtained in violation of constitutional rights requires reversal regardless of other evidence of guilt." (*People* v. *Lilliock* (1965) *supra,* 62 Cal.2d 618, 621, 622.) In that first trial, the jury had returned a verdict finding Lilliock guilty of first degree murder and was hearing evidence to determine whether he should receive a death penalty or a life sentence. It was in this posture of the trial proceedings that defendant took the stand and made the statement that he had reached into Kretchman's pocket and taken the car keys. We cannot say that he took the witness stand for reasons other than being confronted with his illegal confessions, which the prosecution had introduced in the guilt phase of that first trial. The statement was, therefore, tainted with illegality. (*People* v. *Spencer* (1967) 66 Cal.2d 158, 165-169 [57 Cal.Rptr. 163, 424 P.2d 715].) The statement should have been excluded as a "fruit of the poisoned tree" and not used for any purpose on this second trial. (*Harrison* v. *United States* (1968) *supra,* 392 U.S. 219 [20 L.Ed.2d 1047, 88 S.Ct. 2008] ; *People* v. *Polk* (1965) *supra,* 63 Cal.2d 443, 449-450.)

The prosecution used the tainted statement both on the merits to support its theory that defendant was guilty of a robbery-murder, either as a coconspirator or an aider and abettor, and for the purposes of impeachment.[1] The statement

[1]In his opening argument, the prosecutor stated: ". . . I do not see how you could draw an inference other than he is as guilty as Mr. Williams of this crime. ¶ You will recall when Mr. Lilliock was on the stand.

was tantamount to a confession of a first degree murder under the theory on which the conviction on the first trial was reversed. (*People* v. *Lilliock* (1965) *supra*.) Just as the prosecutor argued, the statement in the context of the other evidence amounted to an admission of a robbery out of which the death resulted.

Although the verdict was for murder of the second degree and not of the first degree, nevertheless upon this appeal the People being "the beneficiary of a constitutional error," the Attorney General bears the heavy burden of demonstrating beyond a reasonable doubt that the admission of the illegal statement and the prosecutor's argument based thereon did not contribute to the defendant's conviction. (*Chapman* v. *California* (1967) 386 U.S. 18, 26 [17 L.Ed.2d 705, 711, 87 S.Ct. 824].) On the record before us, we are unable to state that "beyond a reasonable doubt the error complained of did not contribute to the verdict obtained" (*Chapman* v. *California, supra,* at p. 24 [17 L.Ed.2d at p. 710]). The conviction, therefore, cannot stand. (See *People* v. *Ross* (1967) 67 Cal.2d 64, 76-86 [60 Cal.Rptr. 254, 429 P.2d 606] [Chief Justice Traynor's dissent]; case reversed *sub nomine Ross* v. *California* (1968) 391 U.S. 470 [20 L.Ed.2d 750, 88 S.Ct. 1850].)

### *Second Degree Murder Instruction Deficient*

■ The instructions pertaining to the crime of murder of the second degree were inadequate. A general instruction on

---

I showed him some testimony from a prior proceeding. It was his testimony and he testified at that time that he himself took Mr. Kretchman's keys out of Mr. Kretchman's pocket. ¶ Now, how is he going to overcome that? He previously testified under oath that he took Mr. Kretchman's keys out of Mr. Kretchman's pocket. ¶ There is further evidence that he and Williams continued to commit this crime. . . ."

In his closing argument, the prosecutor referred to the statement twice:
". . . Mr. Leckie said there is no evidence of robbery here because there is no evidence before us. . . . If I strangled this gentleman right here, grabbed him by the throat and strangled him and removed his car keys from his pocket, that certainly is robbery. I think that is what occurred in this case."

". . . Mr. Leckie also says that we have been in no way able to impeach what Mr. Lilliock said on that witness stand. Mr. Lilliock told you on that witness stand that he got the keys to Kretchman's car from Mr. Williams and yet he testified in a prior trial that he himself took the car keys out of Mr. Kretchman's pocket. Now, if that is not impeachment, ladies and gentlemen, what is? He testified under oath at a prior trial directly contrary to what he told us here. He told us he got those keys from Mr. Williams and previously he testified he got those keys out of Mr. Kretchman's pocket. . . ."

murder[2] was followed by a specific instruction on second degree murder, which read as follows:

"Murder of the second degree is the unlawful killing of a human being with malice aforethought which is not perpetrated by means of poison or lying in wait, or torture or by any other kind of wilful, deliberate, and premeditated killing, and which is not committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, mayhem, or any act punishable under section 288 of the Penal Code.

"In practical application this means that the unlawful killing of a human being with malice aforethought is murder of the second degree in any of the following cases:

"(1) When there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish wilfulness, deliberation and premeditation, or (2) When the killing results from an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial motive and with wanton disregard for human life, or (3) When the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life."

This instruction is all right as far as it goes, but nowhere did the court instruct the jury what constituted a felony inherently dangerous to human life and within the realm of the evidence, other than robbery and burglary enumerated in the first paragraph. We, therefore, encounter the problem pointed out by the court in *People* v. *Failla* (1966) 64 Cal.2d 560, 564-565 [51 Cal.Rptr. 103, 414 P.2d 39]. The court held in effect that if the court mentions felonies as matters to be considered by the jury in arriving at a proper verdict, it must define what such felonies are for the edification of the jury.[3]

---

[2] "Murder is the unlawful killing of a human being, with malice aforethought. The word 'aforethought' means only that the intent must precede the act as distinguished from afterthought. 'Aforethought' does not imply deliberation or the lapse of considerable time. As used in connection with murder, 'malice' may be either express or implied. Malice is express when there is an intention unlawfully to kill a human being. Malice is implied (1) when the killing results from an act involving a high degree of probability that it will result in death, which act is intentionally done for a base, antisocial motive and with wanton disregard for human life; or (2) when the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life. The term 'malice' does not necessarily imply a preexisting hatred or enmity toward the person killed.''

[3] See also the following instruction given: "In a crime such as that of which defendant is charged in the information, there must exist a union or joint operation of act or conduct and a certain specific intent. In the crime of MURDER UPON THE FELONY MURDER THEORY there must exist in

Jurors are not expected to know the law without adequate instructions thereon by the court. (Cf. *People* v. *Love* (1960) 53 Cal.2d 843, 851-852 [3 Cal.Rptr. 665, 350 P.2d 705].) Without instruction the jury could not have been expected to know that an assault by means of a force likely to produce great bodily injury is a felony (Pen. Code, § 245) and one inherently dangerous to human life. Had this instruction been given, a second degree murder verdict could have been returned upon defendant's direct testimony alone. (See *People* v. *Williams* (1965) 63 Cal.2d 452, 457 [47 Cal.Rptr. 7, 406 P.2d 647].) That testimony was given before any improper statement from the penalty phase of the previous trial came in.

Upon direct examination by his counsel, defendant testified that he went into the bathroom with a towel in his hand. He further testified that as he came out of the bathroom, he had seen his codefendant Williams jump Kretchman as Kretchman came in through the kitchen door and then wrestle Kretchman to the floor. Defendant then tried to get out through a window above the bed, but was unable to get the window open. Then he ran to the kitchen and there saw Williams still wrestling with Kretchman on the floor. He heard "mumbling and groaning." Then Williams said to him, "You better get me something to tie this man up with," or something like that and then he said something about some car keys. Defendant still had the towel in his hand and he either laid it down or threw it. He might have come into contact with Kretchman with his "leg or something like [it]" at the time. The photographs depict what appears to be a bloody bath towel wrapped around Kretchman's right wrist. Another photograph depicted a ransacked suitcase left on the toilet seat. These photographs were in evidence prior to defendant's taking the stand. The defendant by his false statements to the neighbors, Alison and Leipleim, prevented them from coming to Kretchman's rescue.

The foregoing evidence is more than sufficient to find defendant guilty of second degree murder as an aider and abettor to an assault by means of a force likely to produce great bodily injury (Pen. Code, § 245; *People* v. *Williams* (1965) *supra,* 63 Cal.2d 452, 457). But this theory could not

the mind of the perpetrator the specific intent to commit theft at the time of entry into the building and unless such intent so exists that crime is not committed." This has a limited application to a burglary-murder, but not to other types of felony-murders within the possible scope of the evidence.

have been considered by the jury because of the deficient jury instructions. Consequently, despite the adequacy of the evidence to sustain a felony-murder of the second degree, the conviction cannot be sustained on appeal upon this theory, which was not presented to the trier of fact. (*Giordenello* v. *United States* (1958) 357 U.S. 480, 487-488 [2 L.Ed.2d 1503, 1510, 78 S.Ct. 1245].) Despite the fact that the jury could have found a murder of the second degree under subdivisions (1) and (2) of the last paragraph of the instruction given, the defect in subdivision (3) was such that the instruction did not compel the jury to make a finding of malice independent of a felony dangerous to human life. As such, the instruction was defective and constituted reversible error.[4] (Cf. *People* v. *Phillips* (1966) 64 Cal.2d 574, 584, fn. 9, and 585 [51 Cal.Rptr. 225, 414 P.2d 353].)

### *Felony-Murder Instructions Not Barred by Statute of Limitations*

The criminal acts in this case occurred on October 28, 1962. The original information (superior court No. 265,766), later dismissed pursuant to section 1382 of the Penal Code, charged only the crime of murder. The hearing on the new felony complaint did not take place until November 30 and December 1, 1965. Only murder was charged in the current information (superior court No. 314,792). Had any other felonies shown by the evidence been charged, they would have been barred by the statute of limitations. (Pen. Code, § 800.)

The question arose in the course of our review as to whether under these circumstances it is proper to give a felony-murder instruction when the constituent felonies are barred by the statute of limitations. As to the statute of limitations, "the . . . rule is that the statute is jurisdictional, and that an indictment or information which shows on its face that the prosecution is barred by limitations fails to state a public offense. The point may therefore be raised at any time, before or after judgment." (*People* v. *McGee* (1934) 1 Cal.2d 611, 613 [36 P.2d 378]; accord, *People* v. *Rehman* (1964) 62 Cal. 2d 135, 139 [41 Cal.Rptr. 457, 396 P.2d 913].) Supplementary

---

[4]Although the manslaughter instructions were given at defendant's request, they were improper in this case where the statute of limitations had run upon this lesser included offense. (*People* v. *Stevens* (1935) 5 Cal.2d 92, 99 [53 P.2d 133]; Pen. Code, § 800; cf. *In re McCartney* (1966) 64 Cal.2d 830, 832 [51 Cal.Rptr. 894, 415 P.2d 782].) Had the jury returned a verdict finding defendant guilty of manslaughter, the court would have had to set the defendant free.

briefs on this point were asked of counsel. They apparently found no authority directly in point. We have found none in our search to date.

█ If the felony-murder rule were an evidentiary rule creating only a rebuttable presumption of malice (see *People* v. *Washington* (1965) 62 Cal.2d 777, 783, fn. 3 [44 Cal.Rptr. 442, 402 P.2d 130]; note, *Recent Developments—California Rewrites Felony Murder Rule* (1966) 18 Stan.L.Rev. 690, 697), then very little difficulty stands in our way even if the statute of limitations renders the acts insufficient to constitute a public offense. Even an acquittal does not bar the later use of the facts constituting the charged crime. (*People* v. *Griffin* (1967) 66 Cal.2d 459, 464 [58 Cal.Rptr. 107, 426 P.2d 507].) But it is now clear that the felony-murder rule is a rule of substantive law in California and not merely an evidentiary shortcut to finding malice. █ It withdraws from the jury the requirement that they find "either express malice or the implied malice which is manifested in an 'intent with conscious disregard for life to commit acts likely to kill.' [Citations.] The instruction thus relieve[s] the jury of the necessity of finding one of the elements of the crime of murder. [Citations.]" (*People* v. *Phillips* (1966) *supra*, 64 Cal. 2d 574, 584.)

█ Semantically it is difficult to justify the word "felony" in a felony-murder instruction if the acts can never constitute a public offense once the bar of limitations enfolds them. But it must be remembered that the prosecution is for murder and not the constituent felonies. █ "The purpose of the felony-murder rule is to deter felons from killing negligently or accidentally by holding them strictly responsible for killings they commit. . . . It is contended . . . that another purpose of the felony-murder rule is to prevent the commission of robberies. Neither the common-law rationale of the rule nor the Penal Code supports this contention." (*People* v. *Washington* (1965) *supra*, 62 Cal.2d 777, 781 [Chief Justice Traynor speaking for court].) █ In an opinion by Justice Tobriner (now of our Supreme Court), the court in *Davis* v. *Superior Court* (1959) 175 Cal.App.2d 8, 20-21 [345 P.2d 513], held that a prosecution for a conspiracy, a felony (Pen. Code, § 182), was not barred even though the misdemeanors constituting the objective of the conspiracy were barred by limitations when the felony indictment was returned.

We, therefore, hold that a felony-murder instruction may be given in the trial of a murder case even though the prosecution for the constituent felony is barred by the statute of limitations.

## Speedy Trial and Appellate Review

Defendant's claim that he was denied a speedy trial and an expeditious review of his conviction upon retrial has been considered in the light of the following chronology of procedural events:

| | |
|---|---|
| April 22, 1965 | Conviction reversed. (*People* v. *Lillock* (1965) *supra*, 62 Cal.2d 618.) |
| June 22, 1965 | Remittitur filed in Superior Court of Los Angeles County. |
| Sept. 24, 1965 | Proceedings as to defendant and Williams continued to October 4, 1965. |
| Oct. 4, 1965 | Cause continued to October 11, 1965. Defendant given telephone privileges (5 calls per day limit) until next hearing. |
| Oct. 11, 1965 | Bernard A. Leckie appointed as counsel (Pen. Code, § 987a). Cause continued to October 18, 1965. |
| Oct. 18, 1965 | Upon motion of both defendants, district attorney disqualified. (Harold J. Ackerman, co-defendant Williams' court-appointed attorney on previous appeal, had been appointed to second highest post in district attorney's office.) Deputy Attorney General Jack Goertzen appears for People. *Motion of each defendant to dismiss action under Penal Code, § 1382, granted.* Defendants rearrested and arraigned on new felony complaint filed in the Municipal Court, L. A. Judicial District. |
| Nov. 30 and Dec. 1, 1965 | Preliminary hearing conducted in municipal court. |
| Dec. 15, 1965 | Information in this case (superior court No. 314,792) filed. Bernard A. Leckie reappointed counsel for defendant (Pen. Code, § 987a). Defendant's motion to set aside information (Pen. Code, § 995) made and cause transferred to department 104 for hearing and continued to December 23, 1965. |

| | |
|---|---|
| Dec. 23, 1965 | Judge presiding in department 104 [then scheduled for reassignment to department 17, a civil department, effective January 3, 1966] transferred cause to department 17, and continued the hearing to January 7, 1966. |
| Jan. 7, 1966 | Motion under Penal Code, § 995 denied. Defendants plead not guilty. Cause returned to department 100 (master criminal calendar department) for trial setting. |
| Jan. 14, 1966 | Trial set for March 3, 1966, in department 101. Each defendant personally waives time for trial. |
| Feb. 24, 1966 | Motions for severance of trial and for discovery made and heard. Severance denied. Discovery partially granted. |
| Mar. 1, 1966 | Renewed motion for severance granted. Lilliock's trial reset for March 3, 1966. Williams's trial date of March 3, 1966 remained unchanged. His retrial commenced March 3, 1966, jury again returning a verdict imposing death penalty, on March 11, 1966. |
| Mar. 30, 1966 | Cause against Lilliock called for trial. Upon his counsel's motion (counsel engaged), trial was continued to April 4, 1966. Defendant personally waived time for trial. |
| April 4, 1966 | Cause called for trial. Defendant moves for dismissal on grounds of once in jeopardy, former case (superior court No. 265,766) having been dismissed October 18, 1965. Ruling reserved to April 5, 1966. Selection of jury commenced. |
| April 5, 1966 | Motion to dismiss upon grounds of once in jeopardy denied. Jury selected and trial before jury commenced. |
| April 6, 7, 11, 1966 | Trial proceedings take place. |
| April 12, 1966 | Jury returns verdict finding defendant Lilliock guilty of murder of the second degree. Presentence probation officer's report ordered. Hearing on motion for new trial and probation and sentence procedures set for May 17, 1966. |
| May 17, 1966 | Motion for new trial argued and denied. Probation denied. Defendant sentenced to state prison. |

| | |
|---|---|
| May 17, 1966 | Defendant filed notice of appeal in propria persona. |
| Aug. 5, 1966 | Request in propria persona for bail pending appeal made and denied. |
| Nov. 2, 1966 | Request in propria persona for reconsideration or modification of sentence considered and denied, but court directs Department of Corrections to make study per Penal Code, § 1168. |
| Jan. 21, 1967 | Appeal filed in Supreme Court by mistake. |
| Feb. 20, 1967 | Defendant applies to Supreme Court for appointment of appellate counsel. |
| Feb. 27, 1967 | Bernard A. Leckie appointed defendant's counsel in the Supreme Court. |
| May 11, 1967 | Appeal transferred to Court of Appeal, Second Appellate District. |
| | Letter from clerk of Supreme Court to trial and appellate counsel giving notice of transfer and suggesting that counsel advise his client of this action and to apply to the Court of Appeal for reappointment as defendant's appellate counsel. |
| May 19, 1967 | Letter from Lilliock to clerk of Court of Appeal stating that his appeal had been erroneously consolidated with codefendant Williams's automatic appeal to the Supreme Court and asking that Attorney Leckie be appointed as his counsel. |
| May 25, 1967 | Letter from clerk of Court of Appeal advising that defendant's affidavit of indigency had been accepted and that he would be advised when counsel is appointed. |
| June 1, 1967 | Attorney Bernard A. Leckie is appointed as defendant's appellate counsel by Court of Appeal. |
| July 31, 1967 | Appellant's opening brief filed. |
| Dec. 22, 1967 | Respondent's brief filed. |
| Jan. 4, 1968 | Defendant inquires as to status of appeal. Advised it would be calendared as early as possible. |
| May 7, 1968 | Setting for oral argument on May 16, 1968, vacated. Counsel requested to file supplemental briefs and oral argument reset for June 20, 1968. |
| June 20, 1968 | Cause submitted. |

As noted above, the former action (superior court No. 265,766) was dismissed on defendant's motion under section 1382 of the Penal Code for failure to bring him to retrial within 60 days of the filing of the remittitur in the trial court. This dismissal did not bar the refiling of a second action charging murder, for which there is no statute of limitations (Pen. Code, § 799). (*In re Begerow* (1902) 136 Cal. 293 [68 P. 773, 56 L.R.A. 528]; *People* v. *Wilson* (1963) 60 Cal.2d 139, 169 [32 Cal.Rptr. 44, 383 P.2d 452] [Justice Peter's dissenting opinion].) A dismissal of the first action upon defendant's motion and a refiling do not constitute double jeopardy. (*In re Begerow, supra*, p. 297; *People* v. *Wilson, supra*, p. 152; cf. *United States* v. *Ewell* (1966) 383 U.S. 116, 120-121 [15 L.Ed.2d 627, 630-631, 86 S.Ct. 773]; *People* v. *Grace* (1928) 88 Cal.App. 222, 230-232 [263 P. 306].)

The trial date was set for March 3, 1966, after several pretrial motions by the defense, including a motion for severance from codefendant Williams's trial, with defendant's consent (waiver of time for trial). The further continuance of trial to April 4, 1966, was upon the request of defendant's counsel and consented to by the defendant. The trial proceedings were completed in due time. No complaint in this regard is registered by the defendant.

As in *Harrison* v. *United States* (1968) *supra*, 392 U.S. 219, 221 fn. 4 [20 L.Ed.2d 1047, 1051, 88 S.Ct. 2008, 2009, fn. 4], the appellate review was initiated by the defendant. Until his request for appointment of counsel in the Supreme Court he acted in propria persona. While some delays were due to consolidated appeal papers being forwarded to the Supreme Court instead of the Court of Appeal, the error was committed in light of the first appeal where defendant's appeal in the intermediate appellate court was consolidated with codefendant Williams's appeal in the Supreme Court. The error could have been corrected more expeditiously had defendant asked for appointment of appellate counsel in an appellate court more promptly than he did. From the previous appeal, he should have known of the appropriate procedure. Part of the time lapse in the court of appellate review is due to the fact that counsel and this court have been dealing with some new and difficult legal questions as this opinion should reflect.

In *Harrison, supra,* the United States Supreme Court rejected a contention of denial of a speedy trial despite eight years having elapsed from the date of the original indictment

where the delays were in the appellate proceedings, resulting "either from the actions of petitioner [defendant] or from the need to assure careful review of an unusually complex case." The court approved the language of the Court of Appeals found at 387 F.2d 203, 206-207, in disposing of the contention in that court:

"The contention that appellant's Sixth Amendment right to a speedy trial has not been respected is predicated broadly upon the six-year lapse between the homicide and the third trial, but for this purpose we cannot treat litigation spans in a vacuum. 'There is no touchstone of time which sets a fixed maximum period that automatically requires application of the Sixth Amendment and dismissal of the indictment.' Rather, '[t]he right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures a right to a defendant. It does not preclude the rights of public justice.' So in determining whether the delay complained of assumes constitutional proportions, we examine the circumstances closely to ascertain whether it was 'arbitrary, purposeful, oppressive or vexatious.' " (See also *United States* v. *Ewell* (1966) *supra*, 383 U.S. 116, 120 [15 L.Ed.2d 627, 630].)

■ Article I, section 13 of our state Constitution, providing for a defendant's right to a speedy trial, is a reflection of "the letter and spirit of" the Sixth Amendment of the federal Constitution (*People* v. *Wilson* (1963) 60 Cal.2d 139, 144, fn. 2 [32 Cal.Rptr. 44, 383 P.2d 452]) and should be construed and applied in consonance with the Sixth Amendment as thus construed by the United States Supreme Court.

■ The delays were not due to any arbitrary, purposeful, oppressive or vexatious causes. We, therefore, reject defendant's claim that his rights to a speedy trial under both the California and federal Constitutions were violated.

*Right to Counsel at Lineup Not Retroactive*

■ Defendant's contention that failure to appoint counsel for him at a police lineup in which he appeared constituted reversible error, is not well taken. The lineup in question took place shortly after his apprehension on October 29, 1962, long before *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], were decided. ■ The federal constitutional procedural rule of right to counsel at a police lineup applies only to lineups conducted subsequent to June 12, 1967. (*Stovall* v. *Denno*

(1967) 388 U.S. 293, 296, 300 [18 L.Ed.2d 1199, 1203, 1205, 87 S.Ct. 1967]; *People* v. *Feggans* (1967) 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21].) ▮ No question of general fairness of the lineup under due process is involved in this appeal.

### No Error in Admission of Colored Photographs of Decedent

▮ Defendant claims that the admission of photographs of the decedent, especially those in color, were brutal and shocking and should have been excluded, especially in view of his counsel's offer to stipulate that Kretchman is the person depicted in one of the photographs and the man upon whom the autopsy was performed. The contention is premised upon an erroneous assumption that they were not probative of the issues which the jury had to decide.

▮ Whether or not photographs of a deceased person should be excluded because their probative value is outweighed by their inflammatory nature resides primarily in the sound discretion of the trial judge. (*People* v. *Talbot* (1966) 64 Cal.2d 691, 706 [51 Cal.Rptr. 417, 414 P.2d 633], cert. den. 385 U.S. 1015 [17 L.Ed.2d 551, 87 S.Ct. 729]; *People* v. *Thomas* (1967) 65 Cal.2d 698, 706 [56 Cal.Rptr. 305, 423 P.2d 233], cert. den. 389 U.S. 868 [19 L.Ed.2d 143, 88 S.Ct. 140]; *People* v. *Arnold* (1967) 66 Cal.2d 438, 451 [58 Cal. Rptr. 115, 426 P.2d 515].) Mere gruesomeness of photographs is no reason for their exclusion if their probative value outweighs their inflammatory effect. (*People* v. *Mathis* (1965) 63 Cal.2d 416, 423 [46 Cal.Rptr. 785, 406 P.2d 65], cert. den. 385 U.S. 857 [17 L.Ed.2d 84, 87 S.Ct. 105].)

▮ Here, the trial judge determined that they were not unduly gruesome. We have examined the photographs. We cannot say that the determination was an abuse of discretion. On the other hand, their probative value was great, for they alone constitute proof from which the degree of force used on Kretchman can be deduced. Whether the force used was likely to produce great bodily injury so as to justify a finding of a felony murder of the second degree was a critical issue in the case, as we have heretofore pointed out. The colored photographs of the neck area were particularly illustrative of what the pathologist opined was the cause of death. The other pictures showed the pocket of Kretchman's pants turned inside out, how Kretchman had been gagged, and that his dentures had been knocked out. The pictures were also probative of

robbery. We find no error in the admission of the photographs of which defendant complains.

### Recognition of Codefendant's Fifth
### Amendment Privilege Proper

 Defendant contends that when his counsel called codefendant Williams as a witness, the trial court should have compelled him to answer questions over his claim of privilege against self-incrimination, because he had already been tried and sentenced to death for the same offense. He also contends that the trial court should have screened seriatim each individual question rather than uphold a blanket claim of the privilege as to any and all questions which would be put to the witness.

While a defendant whose trial has been severed from that of his codefendant is a competent witness, he nevertheless has the right to protect himself against self-incrimination. (*People* v. *Barnnovich* (1911) 16 Cal.App. 427, 429-430 [117 P. 572].) The fact that he had been convicted and sentenced to death by the trial court does not materially alter the situation. As the trial court correctly pointed out, an appeal was pending and the possibility of a retrial could not be ruled out. Defendant cannot claim prejudice where a codefendant's constitutional privilege against self-incrimination is properly recognized. (*People* v. *Bartges* (1954) 126 Cal.App. 2d 763, 771-772 [273 P.2d 49] ; *People* v. *Gilpin* (1940) 38 Cal.App.2d 24, 26 [100 P.2d 356].)

 After Williams was called and sworn as a witness by defense counsel, he declined answering a question as to his age upon the basis of the Fifth Amendment. The court sustained his claim of privilege as age would go to the issue of identification. We find no error in this ruling. "The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination." (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 476 [16 L.Ed.2d 694, 725, 86 S.Ct. 1602, 10 A.L.R.3d 974].)

 At the conference at the bench, Williams's counsel was present and stated, "Well, now, any questions that would be asked, as I say, your Honor, and I should state to the Court that I advised the defendant [Williams] to refuse to answer any questions which might be asked, on the ground that it might tend to incriminate him and I will advise him that in my opinion it would tend to incriminate him."

The court then asked defense counsel if he understood what Williams's counsel had stated. In reply, defense counsel stated, "Yes. I would also, I didn't want to ask the question before the jury, the question: 'Have you ever been convicted of murder and given the death penalty as a result of this particular incident in this case?' "

[Williams's counsel] : "I think you would be impeaching your own witness."[5]

"THE COURT: That is not a proper question and it would be a matter of impeachment."

"· . . . . . . . . . . . .

[Defense counsel] : "I would also ask him that, if in fact he strangled this man in this cottage and, obviously, the answer would be 'no,' at least I would so advise him anyway."

"THE COURT: With that understanding you want to ask no further questions?"

There was a colloquy between the prosecutor and the court as to whether he (the prosecutor) could inquire into the relationship of defendant and Williams and how they met,[6] previously ruled inadmissible. Following the court's indication that the ruling would stand despite Williams having been called as a witness, proceedings were resumed in open court. At that point, defense counsel stated, "I have no further questions," and the witness was excused.

Having failed entirely to urge upon the trial court that the claim of Williams's privilege under the Fifth Amendment as claimed by his counsel was too broad, it cannot be urged now on this appeal. We further fail to understand how defense counsel could tell Williams, whom he does not represent, how to answer questions which Lilliock's defense counsel will put to him. Until all of Williams's appeal and collateral remedies from his death sentence have been exhausted and possibilities of retrial eliminated, it cannot be said that Williams would not hazard any jeopardy in answering questions which might tend to incriminate him.

---

[5]This took place on April 7, 1966, prior to the Evidence Code coming into force on January 1, 1967. Penal Code, section 1323.5 was also still in force.

[6]The trial court file indicates that the prosecutor had information that defendant and Williams had been released from the Iowa state prison on the same day and had travelled together to Los Angeles via Oklahoma City.

### Other Contentions on Appeal

In view of the disposition we make of this appeal, it is unnecessary to take up the other contentions advanced by the defendant. We have considered the four contentions which the defendant advanced personally. Defense counsel concedes two lack merit. The other two appear wanting in merit. Even if they be deemed valid arguendo, no prejudice has been suffered by the defendant as the result of those claimed errors.

### Disposition

The judgment of conviction is reversed.

Kaus, P. J., and Stephens, J., concurred.