[No. G005032. Fourth Dist., Div. Three. Aug. 15, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT LLOYD SELLERS, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1] Parts I, IV, and V of this opinion (except the dispositional paragraph at the end of Part V) are not certified for publication. (See Cal. Rules of Court, rules 976(b) and 976.1.)

**COUNSEL**

Handy Horiye, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Michael D. Wellington and Carl H. Horst, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SCOVILLE, P. J.**—Defendant, Robert Lloyd Sellers, appeals from a judgment after a jury found him guilty of murder in the first degree (Pen. Code, §§ 187, 189), and rape (Pen. Code, § 261, subd. (2)). The jury also found true the special circumstance allegation that the murder was committed while the defendant was engaged in the commission of the crime of rape (Pen. Code, § 190.2, subd. (a)(17)(iii)).[2] Defendant was sentenced to life imprisonment without possibility of parole based on the first degree murder

---

[2]Defendant was originally additionally charged with burglary and attempted rape. Defendant's demurrer to those counts was sustained on the ground the statute of limitations on those crimes had run, and those counts were dismissed. In addition, the special circumstance allegations of murder in the commission of burglary and attempted rape (Pen. Code, § 190.2, subds. (a)(17)(vii) and (iii)) were dismissed pursuant to the trial court's order granting defendant's Penal Code section 995 motion. We note the California Supreme Court's recent decision in *People* v. *Morris* (1988) 46 Cal.3d 1 [249 Cal.Rptr. 119, 756 P.2d 843] holding that a felony-murder special circumstance is not barred by expiration of the statute of limitations applicable to the underlying crime.

conviction and the special circumstance finding of murder in the commission of rape. He was also sentenced to a consecutive term of six years for the rape and ordered to pay a restitution fine of $15,000.

We find ourselves in the unfortunate position of having to reverse this conviction for a most heinous murder and remand for a new trial because the jury was improperly instructed on the law of rape.

## FACTS

The nude body of S. Anderson was discovered at approximately 7:30 p.m. on Monday, May 14, 1979, by Irvine police officer Jimmy Potts after he was called to her apartment by Anderson's boyfriend and her employer. The men were concerned because Anderson's car was in her apartment garage, but she had not appeared at work that day and she did not respond to telephone calls to her apartment or knocking on her door. When Potts arrived at the scene he noticed all doors to the apartment were locked, and all drapes on the windows were pulled closed. There was no indication of a forced entry. However, the bedroom window on the north side of the apartment was open and had no screen on it. Potts gained access to the apartment through this window.

Anderson's body was lying on the bed, face up; her legs were spread apart and the bed coverings had been folded down. There was a watch on the victim's left wrist and a gold necklace around her neck. Bloody towels covered her face. Potts immediately took steps to secure the crime scene.

The crime scene and other evidence presented at trial, viewed in the light most favorable to respondent, shows that defendant, who was employed as a security guard at the victim's apartment complex, entered her open bedroom window shortly before the end of his work shift on the evening of May 13, 1979. Anderson was talking on the telephone at the time, and defendant waited in her bedroom. Anderson finished the telephone call at 12:03 a.m.[3] When Anderson entered her bedroom and confronted defendant, a struggle ensued during which Anderson ended up on the bed. It is also possible to infer from the evidence the two were already on the bed when the struggle began. Defendant beat Anderson savagely over her head and shoulders with his baton or nightstick. He also strangled her, probably with the Sam Browne belt he was wearing. The beating and strangulation took place on the bed on top of a gold comforter, and Anderson was dressed in a short, red knit, one-piece playsuit and white bikini underpants at the time she was

---

[3] Anderson's mother testified she talked to her daughter on the phone from 10 p.m. to 12:03 a.m. on May 13, 1979.

killed. There were no semen stains on the gold comforter nor on the red playsuit and underpants.

Defendant's replacement, Charles Doyal, arrived at the apartment complex to relieve defendant at about 12:10 or 12:15 a.m. Defendant usually waited in his car for the replacement to arrive; on this night, Doyal found defendant's car, but defendant was not in it. As Doyal drove around the complex looking for defendant, he noticed Anderson talking on the phone in her kitchen. It took Doyal approximately 10-15 minutes to drive around the complex. On his second round of the complex he saw Anderson closing the glass door to her patio and pulling the shades.

Sometime after he had completed the second round of the complex, and approximately 35 minutes after he started the first round, Doyal, sitting in his parked car, saw defendant walking toward him. Defendant was carrying his shirt and his Sam Browne belt. They had a brief conversation, but Doyal did not notice anything unusual about defendant, other than his shirtless condition. Defendant got into his car and left.

Sometime thereafter, defendant returned to Anderson's apartment. He lifted the body off the bed and dragged it into the bathroom where he washed it, first in the sink and then in the tub. In the course of washing the body, defendant removed Anderson's red knit playsuit and her white bikini underpants and dropped them in front of the sink.[4]

Defendant turned down the blankets and top sheet on the bed to hide the massive bloodstains, particularly on the top-gold comforter. He also turned over the pillows on the bed to hide the bloodstains on those objects. He placed the victim's body on the clean lavender bottom sheet and placed a pillow under her head. He put two towels over the victim's face. He had intercourse with the body, and then left locking the door after him.[5]

---

[4] Sandra Wiersema, a criminalist for the Orange County Sheriff's Department, testified neither the red playsuit or the underpants had been torn. There were no semen or urine stains on either garment. The red playsuit had undiluted bloodstains and blood splatters on the front of it, as well as a diluted bloodstain on the back of it. Wiersema testified the pattern of blood splatters on the red garment "would be consistent with having it on at the time of the attack." She further testified the diluted bloodstain on the back of the garment "would be consistent with having it on at a time when water is being applied in the area of the body."

[5] Wiersema testified when she first saw the victim's body, a white sticky substance was oozing from the victim's vagina. There was a large urine stain and two semen stains on the lavender sheet. The semen stains were identified as number one and number two for convenience of description. Semen stain number one was in the middle of the urine stain. Stain number two was in a different spot. Wiersema was asked, "Where was the location of semen stain number one in relationship to the position of [the victim] when you found her on the bed?" She answered, "It was directly under the vaginal area."

Doyal testified that sometime after defendant left the complex he fell asleep in his car. Doyal woke up when he heard a door slam. He estimated he had been asleep for between one and three hours. He saw a car back out of a parking stall and drive toward him with its headlights off. Defendant was driving the car. Defendant asked Doyal if he wanted to go to Spires for breakfast, and Doyal agreed. He got into defendant's car and they left for the restaurant. He noticed that defendant had changed out of his uniform into "civilian clothes."

James White, a criminalist employed by the Orange County Sheriff Department and specializing in forensic serology, conducted chemical tests on bloodstains and semen stains found at the scene. With respect to semen stain number two, White concluded the victim's boyfriend[6] could have been a possible donor, but defendant could not have been. He concluded defendant was a possible donor of semen stain number one, the semen stain found directly under the victim's vaginal area, but he also testified that close to 90 percent of the population would not be excluded as possible donors of that sample.

Dr. Richard I. Fukumoto, a pathologist, testified the lacerations to the decedent's skull were caused by a somewhat elongated blunt instrument and gave his opinion an instrument similar to defendant's baton could have caused those injuries. He also expressed his opinion some of the injuries to the victim's face could have been caused by the baton, while other injuries to her face could have been caused by a fist with a ring protruding from it, or by a buckle similar to the buckle on defendant's Sam Browne belt.

Dr. Fukumoto testified the wounds to the victim's hands and forearms appeared to be defensive wounds, and they occurred before the victim's heart stopped. He noted there was an abrasion on the inside of the left thigh and an abrasion on the outside of the right knee, as well as several contusions below the right knee. In Fukumoto's opinion all injuries to the victim's legs occurred while her heart was still pumping. Dr. Fukumoto also testified that a laceration on the victim's nipple occurred after her heart had stopped.

It was Fukumoto's opinion the victim died from asphyxiation as a result of strangulation by ligature. A ligature approximately two inches wide was used to strangle the victim, and in Fukomoto's opinion defendant's Sam Browne belt could have been used. Fukumoto also expressed his opinion that the blows to the victim's head occurred before she was strangled, and

---

[6] The victim's boyfriend testified he and the victim had had intercourse in the afternoon on Sunday, May 13, 1979.

that she was conscious at the time she was being strangled. The presence of pulmonary edema indicates the victim stopped breathing before her heart stopped pumping; however, the time lapse between these events was "probably no more than one minute, at the most." Fukumoto also testified the approximate time between heart stoppage and brain death is, on the average, six minutes.

It was not until early 1984 that a fingerprint expert finally concluded the bloody palm print on the door molding between the bedroom and the bathroom in the victim's apartment matched defendant's right palm, and that fingerprints discovered on the door molding near the palm print were defendant's.

Defendant was arrested on March 29, 1984, approximately five years after the crime was committed. His home was searched and a baton and a Sam Browne belt were found.

Under police questioning, defendant told several different versions of the events on the night of the homicide. While he consistently admitted the killing, the facts leading up to the event and following it changed considerably in the various versions.

The version told by defendant in the first two interviews was reasonably consistent. In these interviews defendant stated that the victim invited him into her apartment, they had a drink and she began to make sexual advances. He became interested and began to participate. Suddenly she turned on him and ordered him out. She grabbed his arm and his testicles (through his loose fitting pants, as both of them were still clothed). This hurt and he took out his baton or nightstick and began hitting her over the head and shoulders to make her release him. When she finally let go, he realized she was dead. He took her clothes off and washed her off in the shower, then put her back on the bed. He heard his replacement, Doyal, drive by. He took his shirt off because it had blood on it and left by the front door of the apartment. He locked the door when he left. He talked to Doyal, and then went home where he took a shower and changed his clothes. He couldn't sleep so he went back to the apartment complex to see if Doyal wanted to go to breakfast. He denied going back into the victim's apartment. He also said that he didn't "make love" to the victim either before killing her or after.

In the third interview, defendant changed his story. This time he said that he engaged in an act of consensual intercourse with the victim in the bedroom. The victim told him not to "come inside [her]," just before he did. She became enraged, pushed him off her and grabbed his testicles. He hit

her with the baton. When he realized she was dead, he took her body into the bathroom and attempted to wipe it off.

During the fourth interview defendant admitted the victim did not invite him into the apartment. He said he saw her talking on the phone while he was on his rounds. He entered her apartment through an open bedroom window. He stood in the bedroom till she completed her phone call. When she entered the bedroom she asked him why he was there. When he said he was there to see her, she became upset, started screaming, and they struggled. When she grabbed him, he began to hit her with his baton. Sometime during these events, he heard Doyal, his replacement, drive by. When he realized she was dead, he took off his shirt because there was blood on the sleeves, washed the blood off his baton and left through the front door, leaving it unlocked.

After talking to Doyal, defendant drove home, stopping to get some gas first. He took a shower and changed his clothes. Then he drove back to the apartment complex arriving at approximately 1:30 or 2:00 a.m. He returned to the victim's apartment, entering through the front door. He carried her into the bathroom and tried to clean her off in the sink, but it was too small. He took her clothes off and put her in the shower. He turned down the covers on the bed, put the body back on the bed, and covered the face. He had intercourse with the body, got dressed and left through the front door, locking it after him.

## I*

. . . . . . . . . . . . . . . . . . . .

## II

*The Trial Court's Rulings With Respect to the Substantive Crime of Rape and Its Use in the Special Circumstance Allegation*

The trial court made erroneous legal rulings with respect to the nature of the crime of rape that permeated this trial. The defense's version of the facts was that defendant killed the victim and then left the apartment because he knew Doyal was waiting to relieve him. Defendant went home, then returned to the scene after an hour or two, washed the victim's body, laid it back on the bed and had intercourse with it. The physical evidence, as well

---

*See footnote 1, *ante,* page 1042.

as defendant's last statement, supported this version of the facts.[12] The trial court ruled, as a matter of law, it was irrelevant whether sexual penetration took place before or after the victim was dead, and the prosecution could prove rape if it showed defendant intended to rape the victim while she was alive and the actual intercourse was part of a "continuous course of conduct."[13] The trial court also ruled "[t]he defense will be precluded from an argument that you cannot have a rape of a dead body . . . and that's as a matter of law." Based on these rulings, the trial court denied defense motions (1) to dismiss the rape charge and the special circumstance charge of murder during the commission of rape; (2) for acquittal on those two charges; and (3) for new trial. In addition, the trial court refused instructions requested by the defense to the effect that the jury could not find rape or the special circumstance of murder during the commission of rape if the jury believed the victim was dead at the time sexual intercourse occurred. We conclude the trial court's denial of defendant's requested jury instructions constituted prejudicial error and that the judgment must be reversed and the matter remanded for new trial.

■ We conclude, as a matter of law, that the crime of rape as defined in Penal Code section 261 requires a live victim. Penal Code section 261 defines rape as "an act of sexual intercourse accomplished with *a person* not the spouse of the perpetrator" (italics added) under certain described circumstances. The circumstances charged in this case were those set forth in Penal Code section 261, subdivision (2): "Where it [the act of sexual intercourse] is accomplished against a *person's will* by means of force, violence, or fear of immediate and unlawful bodily injury on the person or another." (Italics added.) Rape must be accomplished with a person, not a dead body. It must be accomplished against a person's will.[14] A dead body cannot consent to or protest a rape, nor can it be in fear of immediate and unlawful bodily injury. Penal Code section 263 provides, "[t]he essential guilt of rape consists in the outrage to the person and feelings of the victim of the rape . . . ." A dead body has no feelings of outrage.

In *People* v. *Stanworth* (1974) 11 Cal.3d 588 [114 Cal.Rptr. 250, 522 P.2d 1058] the defendant contended his rape conviction should be reversed be-

---

[12] In fact in his opening and in his final argument the deputy district attorney specifically stated that defendant had intercourse with the victim after she was dead.

[13] In one of his various articulations of this theory the trial judge stated, "Court specifically finds that it does not matter under the facts of this case whether penetration occurred prior to or after death if the D.A. can prove continuous course of conduct. The D.A. doesn't have to prove the victim, in fact, was alive at the time of penetration, in other words."

[14] Thus, in *People* v. *Vela* (1985) 172 Cal.App.3d 237, 242 [218 Cal.Rptr. 161], the court, discussing the question whether rape occurs when a person withdraws consent after penetration, stated, ". . . the presence or absence of consent at the moment of initial penetration appears to be the crucial point in the crime of rape."

cause he shot his victim in the head causing almost instantaneous death prior to having intercourse with the body, and "rape, as defined by the Penal Code, may not be accomplished with a dead person. . . ." (*Id.* at p. 604.) The court held the defendant was precluded from this argument by his guilty plea. Nevertheless, noting the issue was one of first impression (*id.* at p. 604, fn. 15), the court concluded the crime of rape required a live victim in this persuasive dictum: "Rape is defined in Section 261 as 'an act of sexual intercourse, accomplished with a female not the wife of the perpetrator. . . .' The statute, on its face, does not indicate whether a 'female' must be alive at the time the act of sexual intercourse is performed. However, section 263 states that '[t]he essential guilt of rape consists in the outrage to the person and feelings of the female. Any sexual penetration, however slight, is sufficient to complete the crime.' [Citations.] It is manifest that the 'feelings' of a female cannot be offended nor does the victim suffer 'outrage' where she is dead when sexual penetration has occurred. Thus it appears that a female must be alive at the moment of penetration in order to support a conviction of rape under section 261." (*Id.* at p. 605, fn. 15; *People v. Vela, supra,* 172 Cal.App.3d 237, 243.)

Respondent contends the "rape of a dead body" issue is a "red herring"; there was sufficient evidence for the jury to have found sexual penetration premortem and no more was necessary.

Respondent misses the point. Defendant's theory was that intercourse occurred after death. There was ample evidence to support that theory. The law is that a victim of rape must be alive. The defense was entitled to sua sponte instructions on its theory. (*People v. Stewart* (1976) 16 Cal.3d 133, 140 [127 Cal.Rptr. 117, 544 P.2d 1317]; *People v. Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913].) In fact, the defense offered proper instructions which were erroneously rejected by the trial court.

In a paradigm of disingenuousness, respondent suggests this error was harmless. The jury had before it a factual scenario which suggested intercourse took place after the victim's death, and the defense was not allowed to argue and the jury was not instructed that, if they so determined, there could be no rape. The error was prejudicial beyond a reasonable doubt. Regrettably, the error was so pervasive it affected not only the rape conviction, but the special circumstance finding and the first degree murder conviction as well.

Respondent contends "[w]here the facts and circumstances demonstrate a continuous course of conduct, it is unimportant that sexual intercourse occurs after death." Said another way, this is the "continuous transaction" theory espoused by the trial court. (*Ante,* at p. 1050.) Respondent relies on

*People* v. *Goodridge* (1969) 70 Cal.2d 824, 838 [76 Cal.Rptr. 421, 452 P.2d 637] and *People* v. *Quicke* (1964) 61 Cal.2d 155, 158 [37 Cal.Rptr. 617, 390 P.2d 393]. Neither case is applicable. Each concentrates on what is necessary to prove *felony murder,* not what is necessary to prove rape.

In *Quicke* the defendant went out with the victim after telling a friend he "was going to get a piece" before leaving the area. He tried to kiss the victim, and, when she resisted, put his hand over her mouth and nose. When she still refused his advances, he strangled her. He drove six miles to an isolated spot and had intercourse with the body. The California Supreme Court stated, "The evidence supports the verdict of murder in the first degree on the ground that the killing was intentional and premeditated or that it was done in the perpetration of rape." (*People* v. *Quicke, supra,* 61 Cal.2d at p. 158.) The court also stated the facts "support the inference that upon preconceived reflection he deliberately formed a plan to coerce the victim into engaging in intercourse with him while she was alive, or if that failed, to kill her to satisfy his desires with her corpse." (*Id.* at p. 159.) Nowhere does the court discuss the definition of rape or, for that matter, the "continuous-transaction" theory. Furthermore, it is clear the felony murder charge would have been sustained under the facts in *Quicke* even if the defendant had not completed the act of intercourse. ██ 
Felony murder is a killing "which is committed in the perpetration of, *or attempt to perpetrate,* arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288 . . . ." (Pen. Code, § 189, italics added.)[15]

*People* v. *Goodridge, supra,* 70 Cal.2d 824 contains no more support for the trial court's position. The facts in *Goodridge* showed the defendant beat and stabbed the victim to overcome her resistance to an act of intercourse which happened immediately before or after her death from stab wounds. The court concluded the evidence would "support a finding of first degree murder either on the theory that defendant killed [the victim] deliberately and with premeditation or that the killing occurred during the perpetration of rape." (*Id.* at p. 837.) Discussing a claim of incompetence of counsel, the court also stated, "There is no substance to defendant's argument that it is impossible to rape a dead body and therefore trial counsel should have objected to the giving of an instruction on the felony-murder doctrine. Under the felony-murder rule (Pen. Code, § 189) the killing is first degree murder if 'committed in the perpetration or attempt to perpetrate' rape.

---

[15] An attempt will support felony murder. Thus, in this case, the jury was instructed on attempted rape with respect to the felony-murder theory. The statute of limitations on felony murder is, of course, the same as murder and a felony-murder charge could be based on attempted rape even though the statute of limitations had run on attempted rape. (See *People* v. *Lilliock* (1968) 265 Cal.App.2d 419, 430-432 [71 Cal.Rptr. 434].) On retrial the court's decision in *People* v. *Morris, supra,* 46 Cal.3d 1, 18 may be of importance.

Where a defendant *attempts to coerce his victim into intercourse* with him, fails to accomplish his purpose while she is alive, and kills her to satisfy his desires with her corpse, the killing is first degree murder." (*Id.* at p. 838, italics added.) The court does not say, however, that the intercourse in such circumstances constitutes *rape* within the definition of Penal Code section 261. As was said in *People* v. *Booker* (1977) 69 Cal.App.3d 654, 666 [138 Cal.Rptr. 347], citing *Goodridge* and *Quicke,* "When a conviction of first degree murder is based on the theory of killing during an *attempted rape,* it is irrelevant whether the victim was already dead at the time of penetration." (Italics added.)[16]

The so-called "continuous-transaction" theory applicable to felony murder is described in *People* v. *Whitehorn* (1963) 60 Cal.2d 256 [32 Cal.Rptr. 199, 383 P.2d 783].[17] In that case the victim was kidnapped, raped twice by defendant as his codefendant looked on, and then strangled by the codefendant while defendant held her arms at her sides. Defendant requested an instruction that for felony murder "it is necessary to show that death ensued in consequence of the forcible rape." (*Id.* at p. 264.) The court held the instruction was not proper, stating, "Section 189 of the Penal Code has been construed as not requiring a strict causal relation between the felony and the homicide, and the homicide is committed in the perpetration of the felony if the killing and the felony are parts of one continuous transaction. [Citations.]" (*Ibid.*) ▮▮▮▮▮ In felony murder there are two acts, a homicide and an underlying crime. The courts hold the causal connection between them need only be that each is committed in the course of one continuous transaction.[18] How can such a theory be applied to the crime of

---

[16]Under the facts of this case, even if the jury failed to find a deliberate premeditated murder, they could have found first degree felony murder in an *attempt* to perpetrate rape. But if they found no actual sexual penetration premortem, they could not find rape.

[17]*People* v. *McGrath* (1976) 62 Cal.App.3d 82, 86-88 [133 Cal.Rptr. 27], relied on by respondent, is the only California case which takes the continuous-transaction theory out of the felony-murder context. It is, of course, factually distinguishable and, while it reaches a correct result, we do not agree with its reasoning. The defendant was charged with murder and robbery. Instructions were given on grand theft person as a lesser included offense, and the jury convicted the defendant of the lesser crime. In stretching to affirm the conviction, the appellate court rejected the argument that robbery or theft "from the person" requires a live victim, and bolstered its conclusion by relying on the continuous-transaction theory cadged from felony-murder cases. The continuous-transaction discussion was wholly unnecessary to the decision. More than $400 was taken from the victim, and the taking constituted grand theft under Penal Code section 487, subdivision 1, without reference to whether the money was taken from a "person."

[18]There are outside limits to the continuous-transaction theory. The basis of the theory is that the underlying crime is not complete until the defendant reaches a place of temporary safety. Hence a murder committed while the defendant is escaping from the scene of a robbery is committed in the perpetration of the robbery for purposes of the felony-murder doctrine. (*People* v. *Salas* (1972) 7 Cal.3d 812, 821-822 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832]; *People* v. *Boss* (1930) 210 Cal. 245, 250-251 [290 P. 881].) Even under the

rape? It is conceptually impossible. In determining whether rape has occurred, we are not concerned with the connection between two different crimes. We are concerned only with the defendant's and the victim's actions and intent at the time of sexual penetration. ▬▬ The continuous-transaction theory has no place in this determination, although if the victim dies during an attempted rape which is only consummated after death, the felony-murder rule is fully applicable.

The continuous-transaction theory could not be a basis for turning intercourse with a dead body into the crime of rape. Hence, that theory was inapplicable in determining whether the special circumstance alleged here was true. A felony-murder special circumstance under Penal Code section 190.2, subdivision (a)(17) is insupportable without valid proof of the underlying crime. (*People* v. *Morris, supra,* 46 Cal.3d 1, 17-18.) To the extent the special circumstance finding here might have been based on the alleged postmortem "rape," in light of the inadequate rape instructions given in this case, it was in error. However, as noted *infra,* the prosecution also maintained the facts showed premortem rape. In *People* v. *Guzman* (1988) 45 Cal.3d 915 [248 Cal.Rptr. 467, 755 P.2d 917], our Supreme Court, implicitly disapproving *Jones* v. *Superior Court* (1981) 123 Cal.App.3d 160, 165-171 [176 Cal.Rptr. 430], indicates the "continuous-transaction" theory may be applicable in determining whether a special circumstance finding is supported. In truth, the very wording of the applicable statute seems to embody the parameters of the continuous-transaction theory, providing as it does: "The murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, *or the immediate flight after committing or attempting to commit* the following felonies. . . ." (Pen. Code, § 190.2, subd. (a)(17), italics added.)

On retrial the theory may be applicable to prove the necessary link between any premortem rape and the murder. However, appropriate instructions on the theory should be given to the jury.[19] The argument allowed by the trial court on the concept of continuous transaction as applied to the crime of rape and the refusal to give defendant's requested instructions that rape is not possible where the victim is dead constituted prejudicial error.

---

most generous interpretation of the continuous-transaction theory it was inapplicable to the facts proved here. In any case, the theory is inapplicable to the crime of rape.

[19] In the case before us, the prosecution offered a special instruction embodying the continuous-transaction theory, linking the murder and the postmortem act of intercourse. Defendant then requested additional instructions to the effect that the theory is operational only until the defendant has reached a place of temporary safety, based on *People* v. *Mason* (1960) 54 Cal.2d 164, 169 [4 Cal.Rptr. 841, 351 P.2d 1025]; *People* v. *Chavez* (1951) 37 Cal.2d 656, 670 [234 P.2d 632]; and *People* v. *Fuller* (1978) 86 Cal.App.3d 618, 623 [150 Cal.Rptr. 515]. The trial court refused all instruction on the subject, yet allowed the prosecution to argue the continuous-transaction theory to the jury.

## III

### *The First Degree Murder Conviction*

 Unfortunately, the failure to instruct properly on rape tainted the first degree murder verdict as well. The jury was instructed on alternate theories of first degree murder: premeditated murder and various theories of felony murder. The felony murder theories included murder in perpetration of rape or attempted rape and murder in perpetration of burglary or attempted burglary (based on entry with intent to commit rape or theft).

First degree felony murder is the unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a result of the commission or attempt to commit arson, rape, robbery, burglary, mayhem, or any act punishable under Penal Code section 288, and where there is in the mind of the perpetrator the specific intent to commit one or more of these crimes. (Pen. Code, § 189; *People* v. *Dillon* (1983) 34 Cal.3d 441, 475 [194 Cal.Rptr. 390, 668 P.2d 697]; CALJIC No. 8.21 (4th ed. 1979).) The intentional commission of the underlying felony is not only an essential element of the crime of first degree felony murder, it is the sole basis for holding the killing is murder in the first degree. (*People* v. *Anderson* (1968) 70 Cal.2d 15, 34-36 [73 Cal.Rptr. 550, 447 P.2d 942].)

The trial court's failure to give proper instructions on rape rendered any jury finding of rape legally incorrect, including a finding of rape as the underlying crime supporting felony murder. Because the jury was instructed on alternate first degree murder theories and the prosecutor did not request special findings, we cannot say which of those theories formed the basis of the first degree murder conviction. As was said by our Supreme Court in *People* v. *Green* (1980) 27 Cal.3d 1, 69 [164 Cal.Rptr. 1, 609 P.2d 468], "the governing rule on appeal is both settled and clear: when the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand." The error with respect to the instructions on rape in this case rendered the theory of felony murder based on rape legally incorrect, and a conviction on that theory would have been erroneous. Under these circumstances, the first degree murder conviction must be reversed and the cause remanded for new trial. (*Ibid*; *People* v. *Garewal* (1985) 173 Cal.App.3d 285, 303 [218 Cal.Rptr. 690].)

IV, V*

. . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion.

Crosby, J., and Luesebrink, J.,† concurred.

A petition for a rehearing was denied August 25, 1988.

---

*See footnote 1, *ante,* page 1042.
†Assigned by the Chairperson of the Judicial Council.