[Crim. No. 6528.    In Bank.    May 17, 1960.]

THE PEOPLE, Respondent, v. ROBERT L. MASON, Appellant.

Carl B. Shapiro, under appointment by the Supreme Court, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Respondent.

TRAYNOR, J.—A jury found defendant guilty of the first degree murder of Suzan Jamerson and fixed the penalty at death. It also found him guilty of an assault with a deadly weapon with intent to murder Rona Porrazzo, Suzan's daughter. (Pen. Code, § 217.) The trial court denied defendant's motion for a new trial and entered judgment on the verdicts. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

Defendant met Rona and her husband several years before the homicide and was a frequent visitor at their home. On a Sunday afternoon in the summer of 1957, Rona came home after visiting her mother and found defendant alone in the house. An argument developed over a loan of $20 defendant claimed he made to Rona's mother, and Rona picked up the telephone to call her mother to ask about the loan. Defendant grabbed Rona and wrested the phone from her. Rona then said that she had to get ready to go to work, and defendant asked her to drop him off on her way, which she did. Rona complained about the incident to her husband, and he asked defendant not to come to the house when he was not there.

Rona testified that on February 27, 1958 defendant came to the house in the evening after she had returned from church and put her 4-year-old son to bed. Her husband was at work at a nightclub as a musician. Defendant entered, and they sat

in the kitchen drinking coffee and talking. About 12:50 a. m. Rona told defendant that it was time to leave. Defendant attempted to embrace her, and she pushed him away. He then threw her down on a couch and attempted to choke her, first with his hands, and then with his necktie, which broke. He accused her of being "more than friendly" and "that way" with other friends and complained that she would not even be nice to him. Defendant left after Rona promised not to call the police. Rona required medical treatment because of this attack, and she filed a criminal complaint against defendant. The jury was unable to reach a verdict, and the action was dismissed. Defendant has at all times denied that he attacked Rona on February 27th or that he was at her home that evening. He testified that Rona accused him to protect the person who actually attacked her and that his subsequent meetings with her were to make her tell the truth about the February 27th incident.

Because of fear of defendant and the fact that he had a key to their Hollywood home, Rona and her husband and son moved in May 1958 to a house in Glendale located behind a duplex where Rona's mother lived.

About 1:30 a.m. in the morning following Thanksgiving Day, 1958, Rona left the restaurant where she worked and went to her car at a nearby parking lot. She testified that defendant appeared, attacked her with his hands and fists, and threatened to kill her and her husband if she "put the finger" on him this time. Defendant testified that the meeting was prearranged and that Rona attacked him first by hitting him on the head with her shoe. After this encounter Rona's husband bought her a gun, and they made arrangements so that Rona would not have to drive home from work alone.

In January 1959 Rona's husband was working at a nightclub in Las Vegas and his mother and father were staying at the Glendale home with Rona and her son. Shortly after 2 a.m. Rona's supervisor drove her home from work, and her father-in-law met her at the front door. She went toward the back of the house, which was dark, and defendant, who had entered surreptitiously through the back door or window, grabbed her arm, struck her on the head with a screw driver, and dragged her through the kitchen toward the back door. She screamed and her mother-in-law and father-in-law came to her assistance. Her father-in-law got the screw driver away from defendant, who then escaped. Owing to the darkness, Rona could not identify defendant at the time, but he admitted at the trial that it was he who was involved in this incident.

Rona's parents-in-law moved away from the Glendale home, and Rona and her son joined her husband in Las Vegas. The weekend before Tuesday, February 17, 1959, Rona's husband drove them back to Glendale. He returned to Las Vegas on Monday, and Rona and her son moved into her mother's home in the duplex on the front of the property. Rona was afraid to stay alone in the house in the rear.

Early in February defendant arranged with a friend to buy a revolver, and on the 16th of February they took it out in the country and tested it. That night about 10 p.m. defendant took the gun and entered Rona's house through the back door. He testified that he had talked to Rona on the telephone and that she had asked him to come. She testified that there was no such conversation. Defendant stayed in the house alone that night and the next day. About 6 or 6:30 p.m. on February 17th, Rona came home with her mother and son. She intended to return to Las Vegas the next day. She wanted to get a sweater from her house before going into her mother's house and asked her mother and son to go with her. She thought she had her gun in her coat pocket at the time. After the three entered the house, Rona saw what appeared to be an arm in a coatsleeve showing through the opening in the bedroom closet door. She screamed and ran, and defendant came out of the closet with a gun in his hand. Shots were exchanged, and Rona's mother was killed and Rona was seriously injured by bullets from defendant's gun. Defendant escaped and was subsequently arrested in Arizona.

Defendant testified that he took the loaded gun to Rona's home solely to frighten her so that she would tell the truth about the February 27th attack. He hid in the closet when he saw Rona approaching with her mother and son intending to wait there until they left to see Rona alone. Rona tried to pull the closet door open and he tried to hold it closed. When he finally came out of the closet, Rona ran into the living room and screamed. He then ran into the living room and observed Rona's mother standing in a hallway between the bedroom and kitchen. A shot was fired and defendant drew his gun and started shooting.

Defendant also testified that he commenced having sexual relations with Rona in 1957 and continued to do so until just before the attack of February 27, 1958, and there is evidence that he told Rona's husband that he had done so and otherwise sought to break up the marriage. Rona testified that she had never had sexual relations with defendant.

■ The evidence is sufficient to support the verdicts. Whatever resolution the jury made of the conflict between defendant's and Rona's testimony with respect to the attack on February 27, 1958, and the events leading up to it, it could reasonably conclude that thereafter defendant developed a growing animosity toward Rona either because of her rejection of him or accusations against him. Thus, he attacked her with his hands the day after Thanksgiving 1958, with a screw driver in January 1959, and with a recently-acquired gun on February 17, 1959. The jury could find that the last attack was a deliberate and premeditated attempt to kill Rona that resulted in the death of her mother. Such a killing is murder of the first degree. (*People* v. *Sutic,* 41 Cal.2d 483, 491-492 [261 P.2d 241] ; Pen. Code, § 189.)

■ Even if the jury was not convinced that defendant had formed a deliberate and premeditated intent to kill Rona, it could have concluded that the killing was murder of the first degree because it was perpetrated by means of lying in wait or was committed in the perpetration of burglary. (Pen. Code, § 189.) ■ The jury was fully instructed on both of these theories, and contrary to defendant's contention, the lying in wait instructions did not eliminate malice aforethought as an essential ingredient of murder perpetrated by means of lying in wait. The instructions were substantially those approved in *People* v. *Atchley,* 53 Cal.2d 160, 175 [346 P.2d 764], and made clear that although a specific intent to kill is not required to commit murder by lying in wait, "it is necessary that there be the intentional inflicting of bodily injury upon the person killed under circumstances likely to cause his death."

Defendant contends that the trial court erred in instructing the jury with respect to murder committed in the perpetration of.burglary on the ground that the burglary, if any, was completed when defendant entered the house with the intent to commit the felony of assault with a deadly weapon (Pen. Code, §§ 245, 459) and that therefore the killing about 20 hours later was not committed in the perpetration of burglary.

In *People* v. *Chavez,* 37 Cal.2d 656, 669-670 [234 P.2d 632], we stated: "The law of this state has never required proof of a strict causal relationship between the felony and the homicide. The statute was adopted for the protection of the community and its residents, not for the benefit of the lawbreaker, and this court has viewed it as obviating the necessity for, rather than requiring, any technical inquiry concerning

whether there has been a completion, abandonment, or desistence of the felony before the homicide was completed.

"In *People* v. *Boss,* 210 Cal. 245, 252, 253 [290 P. 881], this court said that the felony murder rule '. . . was adopted to make punishment of this class of crime more certain. It was not intended to relieve the wrongdoer from any probable consequences of his act by placing a limitation upon the *res gestae* which is unreasonable or unnatural.' The homicide is committed in the perpetration of the felony if the killing and felony are parts of one continuous transaction. (*People* v. *Miller,* 121 Cal. 343 [53 P. 816].)"

Although the killing in the present case occurred about 20 hours after defendant entered the house, if the jury found that defendant committed burglary by entering the house with the intent to commit a felonious assault, the homicide and the burglary were parts of one continuous transaction. (See *People* v. *Witt,* 170 Cal. 104, 106 [148 P. 928]; *People* v. *Kelso,* 25 Cal.2d 848, 851 [155 P.2d 819]; *People* v. *Morlock,* 46 Cal.2d 141, 146-147 [292 P.2d 897]; *People* v. *Cheary,* 48 Cal.2d 301, 310, 318 [309 P.2d 431]; *People* v. *Jones,* 52 Cal.2d 636, 651 [343 P.2d 577].) Accordingly, the trial court did not err in instructing the jury that murder committed in the perpetration of burglary is murder of the first degree.

Defendant contends finally that it is a denial of due process of law to permit the jury to fix the penalty without prescribing standards to guide the exercise of its power. It is settled, however, that the selection of life imprisonment or death as the punishment for first degree murder is within the absolute discretion of the jury. (*People* v. *Green,* 47 Cal.2d 209, 232 [302 P.2d 307]; *People* v. *Friend,* 47 Cal.2d 749, 764-768 [306 P.2d 463]; *People* v. *Jones,* 52 Cal.2d 636, 652 [343 P.2d 577].)

The judgment and the order denying the motion for a new trial are affirmed.

Gibson, C. J., Schauer, J., McComb, J., Peters, J., White, J., and Dooling, J. pro tem.,* concurred.

Appellant's petition for a rehearing was denied June 14, 1960.

---

*Assigned by Chairman of Judicial Council.