[Crim. No. 8477. Second Dist., Div. Four. June 12, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. MURRAY HOWARD JACKSON, Defendant and Appellant.

Cooper & Nelsen and Maxwell S. Keith for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J.—By information defendant was charged with murder and two counts of abortion. Count II of the information charged defendant with the murder of Sylvia Rayner. Counts I and III charged the commission of abortions upon the persons of two women whom we designate by their given names, Brigitte and Katherine. Defendant pleaded not guilty to all counts. After jury trial defendant was found guilty as charged. Motions for a new trial and probation were denied and defendant was sentenced to the state prison for the terms prescribed by law, sentences to run concurrently

as to each count. Defendant appeals from the judgment of conviction.

Defendant does not challenge the verdicts of guilty as to the abortion counts. The sole ground for this appeal is that the evidence is insufficient as a matter of law to support defendant's conviction of murder in the second degree.

The People's evidence in support of the murder charge discloses that defendant attempted to abort the deceased and in doing so followed substantially the same plan as was followed in the two abortion counts involving other women. For this reason a brief statement of the evidence in support of those counts is necessitated.

It was stipulated that defendant is a duly licensed and practicing doctor of osteopathy.

In proof of count I, Brigitte testified that in May 1961, believing herself to be pregnant, she went to see defendant who agreed to perform an abortion upon her for $300. She was instructed to disrobe and to recline on an examination table with her feet in stirrups. After administering an anesthetic, defendant proceeded to "scrape" her womb. The "scraping" process was repeated on two later dates. On these latter occasions defendant was assisted by Phillip Clusky, one of defendant's patients, who had had no previous medical training whatever. Before each "operation" defendant gave Brigitte a shot to put her to sleep. Defendant told her the drug he was using to "put her out" was sodium pentothal.

Clusky testified at length as to the manner in which he assisted defendant in the abortion of Brigitte. He described in detail how he kept her from moving on the operating table when defendant inserted instruments into her. Clusky also testified he was present during a second operation performed by defendant on Brigitte. He described how defendant instructed him in the use of a hypodermic needle which he held in place in the abortee's arm while the operation was taking place.

In proof of count II, Katherine testified she went to defendant for an abortion after a friend of defendant introduced her to defendant. She gave this friend $450 to pay defendant for the abortion. She stated that, after being placed on defendant's examination table, defendant gave her a shot and inserted an instrument into her vagina, causing her to feel pain. When this operation failed to produce the desired results she again contacted defendant. A series of shots was then given to her by defendant but these also failed to bring

on her menstrual cycle and defendant instructed her to return for another operation. On the occasion of the second operation, a girl friend of Katherine, Eilleen, accompanied her to defendant's office and assisted defendant by keeping Katherine from moving about on the operating table. When Katherine again missed her period still another operation was performed on her by defendant with Clusky assisting. Defendant told her before the operation that he would use sodium pentothal as an anesthetic.

Katherine testified that, at a later date, defendant examined her again. He said he was worried and asked that she visit a doctor friend of his. Defendant directed her to tell this doctor that she was married and that she had had a miscarriage and was bleeding heavily. Both the doctor to whom she was referred and Clusky corroborated Katherine's testimony.

Additional evidence disclosed that two other women also went to defendant for abortions. Clusky corroborated the testimony of both of these women, stating that he was present and assisted defendant on each occasion.

The evidence presented in support of the murder charge (count II) is as follows: Ralph Adams testified that the deceased, Sylvia Rayner, was his "girl friend" and that he had been "having intimate relations" with her for six months prior to her death. He stated that he and Sylvia were acquainted with a Brigitte, and that through Brigitte they met defendant. He drove Sylvia to defendant's office approximately one week before her death for an examination to determine if she was pregnant. He took her to defendant's office nearly every day thereafter until the day of her death. She told him she was going to defendant for an abortion; that the cost would be $300. Adams testified he gave Sylvia $200 to give defendant as a partial payment for the abortion. He stated that Sylvia told him after the July 7th visit that "she had something inserted in her."

On July 8, the date of death, Sylvia was ill and Brigitte was staying with her. Adams called a number of times to inquire how she was feeling and spoke to both Sylvia and Brigitte.

Brigitte testified that, approximately one month before Sylvia's death, she talked to Sylvia and Mr. Adams about Sylvia's going to defendant for an abortion. She was later informed by Sylvia that defendant had agreed to perform the

abortion. On the morning of July 8, Sylvia was ill, and Brigitte was with her. Both women talked to defendant on the phone. Brigitte testified that ''Dr. Jackson [defendant] told me to bring Sylvia down to his office, and he would operate on her.'' Before the women left the apartment where Sylvia was staying to go to defendant's office, Brigitte observed a rubber catheter inside a shower cap lying on top of Sylvia's purse. On the way to defendant's office Brigitte's car broke down. After defendant was notified, Clusky was sent by defendant to pick up Sylvia.

Clusky testified that he drove Sylvia to defendant's office. After waiting in the outer office for approximately half an hour, defendant called him into the examining room. Sylvia was lying unconscious on the examination table with her feet in the stirrups. Defendant asked Clusky to hold a hypodermic needle and to keep Sylvia from moving. After taking his position at the operating table, Clusky observed that Sylvia was not breathing. He informed defendant, and defendant then administered artificial respiration, gave the deceased oxygen, and administered a drug. After attempting for more than an hour to revive her, defendant asked Clusky what he should do, and Clusky stated that he should call the police, which he did. A short time thereafter, the sheriff's deputies arrived.

In a statement to the deputies, defendant stated that Sylvia did not come to his office for an abortion; that he was merely giving her a pelvic examination. She was bleeding and he was unable to locate her cervix. He checked her blood pressure and found it normal. He gave her atropine and dilaudid, waited for the drugs to take effect, then gave her sodium pentothal. Shortly thereafter, she stopped breathing. When more than an hour's efforts to revive her failed, he pronounced her dead and called the police.

A shower cap and a rubber catheter were found by the sheriff's deputies in the treatment room where the deceased was found. Defendant stated that he knew nothing about the catheter, that the first time he saw it was about the time the deputies arrived, that it was lying on the floor of the treatment room.

In his testimony, defendant stated a building inspector had advised him he was not permitted to use any gaseous anesthetics such as ether in his office because of the explosive hazard. Defendant maintained that the only general anesthetic he could use on Sylvia under the circumstances was sodium

pentothal. He admitted, however, there was a hospital one mile away from his office, and that he could have taken the deceased there in a matter of minutes. Defendant contradicted Clusky by denying that the latter had ever assisted him during any treatment or examination of the women involved.

Medical testimony introduced by the People showed the cause of Sylvia's death to be bilateral pulmonary congestion caused by the injection of sodium pentothal. Medical testimony was also given that sodium pentothal is a dangerous anesthetic; that it is normally used in a hospital with nurses in attendance; that it should never be used merely for the purpose of facilitating an examination; and that it can cause a patient's death from several possible conditions.

An autopsy of the deceased disclosed a fetus of two and one-half months and also the existence of a hemorrhagic wound tract caused not more than 48 hours before the time of death, in the uterus of the deceased.

Medical instruments used in performing a "D and C" operation were found in defendant's possession. Medical testimony described a "D and C" as "an abbreviation for a dilation and curettage, which means a spreading open of the cervix of the uterus and a scraping out of the inside lining of the uterus." The medical testimony also described the risk to the life of a patient in a "D and C" operation.

Defendant's argument on appeal is narrowed to a single issue, namely, the cause of Sylvia Rayner's death. It is defendant's contention that "the evidence presented was insufficient as a matter of law to prove that the alleged attempted abortion performed by defendant upon the person of the deceased was the proximate cause of her death." Defendant readily admits that, under the circumstances of this case, he could have been found guilty of manslaughter, on the basis of his having administered the death-causing anesthetic, a lawful act performed in a manner dangerous to life. Defendant maintains, however, that he should not have been found guilty of murder in the second degree because Sylvia's death was not proximately caused by the wound in her uterus (which wound presumably resulted from the insertion of a foreign object in an attempt to procure an abortion), but by the injection of the sodium pentothal; that the death was not the result of the charged felonious act (abortion), but was the result of an unforeseeable intervening cause (the anesthetic), which cause defendant contends should have been found to be

a supervening cause, relieving defendant from any legal liability under felony-murder law.

A number of cases are cited by defendant to support his contention that the question of foreseeability should have been considered. In each of these cases, however, the intervening force or cause which contributed to the death was the act of someone other than the particular defendant involved. These cases have no application in the consideration of the facts of the case before us. In this case, the acts of defendant alone were the cause of Sylvia Rayner's death.

The rule of law applicable to the case at bench is as stated in *People* v. *Miller,* 121 Cal. 343 [53 P. 816], and reaffirmed in *People* v. *Mason,* 54 Cal.2d 164, 169 [4 Cal.Rptr. 841, 351 P.2d 1025]: ". . . a homicide is committed in the perpetration of a felony when the killing and felony are parts of one continuous transaction. [Citations.]" (*People* v. *Cartier,* 54 Cal.2d 300, 310 [5 Cal.Rptr. 573, 353 P.2d 53].)

We hold that under the circumstances of this case the injection of the anesthetic was a part of the unlawful act of abortion. The anesthetic, the dilation, the curettement, were all acts which, when taken together, comprised the criminal plan, the res gestae of the crime. The purpose of the anesthetic was to assist defendant in the dilation and curettement, each act being part and parcel of the criminal act.

Defendant in his argument poses a question in which he draws an incorrect inference from the evidence presented at the trial. He asks, "Must he foresee, as a matter of law, that an injection of sodium pentothal *some two days after an alleged attempted abortion* might produce death." (Italics added.) Defendant concludes the evidence shows that the wound was caused two days prior to the use of the anesthetic. However, the autopsy surgeon testified: "In my opinion this wound tract is of recent origin, and I would say is not over 48 hours in duration." There is no reason to conclude from the testimony given that the wound was caused two days before the injection. The only other evidence presented as to the time when the wound was caused appears in defendant's statement to the arresting officers. Defendant stated that, after administering sodium pentothal, he "examined" Sylvia in the pelvic area, using a speculum, but could not locate her cervix. We are of the opinion the evidence presented was sufficient to support a finding by the trier of fact, that the anesthetic was given in preparation for and immediately preceding an attempt to abort the victim.

Furthermore, evidence of a precise causal connection between the felony and the resulting homicide is not required under California law. This was clearly brought out in *People* v. *Chavez*, 37 Cal.2d 656 [234 P.2d 632] at pages 669-670 when the court stated: "In his argument, Chavez erroneously assumes that to bring a homicide within the terms of section 189 of the Penal Code, the killing must have occurred 'while committing,' 'while engaged in,' or 'in pursuance' of the named felonies, and that the killing must have been 'a part of' the felony or attempted felony 'in an actual and material sense, and have resulted as a natural and probable consequence thereof.' *The law of this state has never required proof of a strict causal relationship between the felony and the homicide.* The statute was adopted for the protection of the community and its residents, not for the benefit of the lawbreaker, and this court has viewed it as obviating the necessity for, rather than requiring, any technical inquiry concerning whether there has been a completion, abandonment, or desistence of the felony before the homicide was completed." (Italics added.) (See also *People* v. *Ketchel*, 59 Cal.2d 503, 524-525 [30 Cal.Rptr. 538, 381 P.2d 394], and *People* v. *Harrison*, 176 Cal.App.2d 330, 343 [1 Cal.Rptr. 414].)

The judgment is affirmed.

Burke, P. J., and Kingsley, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 7, 1963.