[Crim. No. 15199. Second Dist., Div. One. Apr. 3, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. LEROY BAGLIN, Defendant and Appellant.

412

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas E. Warriner, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—Charged by information with murder and a prior felony conviction; defendant pleaded not guilty and denied the prior. An expert was appointed to examine him as to his sanity (Evid. Code, § 730), and defendant thereafter entered an additional plea of not guilty by reason of insanity and two more experts were appointed to examine defendant (Pen. Code, § 1027; Evid. Code, § 730). Subsequently he withdrew his plea of not guilty by reason of insanity, and the court—jury having been waived on such issue—found the alleged prior felony conviction to be true. After a jury trial defendant was found guilty of first degree murder and the penalty fixed at life imprisonment. He appeals from the judgment; the attempted appeal from the order denying defendant's motion for a new trial is dismissed.

Myron Johnson was the owner of an auto parts store in Palmdale. Shortly before 8 p.m. on August 11, 1967, James Bland heard a shot inside the store and saw a man, later identified as defendant, run from the store; he carried a gun in his right hand and a generator box in his left; entering a blue Plymouth he drove away. A few seconds later Bland saw Johnson come out of the store; his chest was bleeding and he told Bland he had been shot and was dying. Deputy Sheriff Compton responded to Bland's telephone call; upon arrival

he saw Johnson lying on the sidewalk with Bland bending over him; he noticed a blood trail from behind the counter of the store to the spot where Johnson was lying. Inside the store Deputy Compton observed a bullet hole through the back wall and removed a slug embedded therein; he testified that it was his opinion that the shot was fired from the customer's side of the counter. Johnson's wallet was empty upon arrival at the coroner's office although, according to his wife, he always kept between 10 and 15 dollars for business transacted after the store was closed.

Deputy Shanley received a radio message of the shooting, including a description of the suspect and his car. After a license check, Shanley ascertained that the car was registered to defendant and that he resided at a certain address. Defendant not being home when Shanley called, the latter was directed to the residence of defendant's girl friend. Upon Shanley's arrival at about 1:30 a.m. defendant was there; near his person Shanley found a .38 caliber revolver and eight .38 caliber bullets. Defendant's car was located later that morning on an old desert road; it was stuck in the sand. A cardboard box containing a generator was found about 100 yards from the vehicle; fingerprints, concededly those of the defendant, were on the generator box. There was testimony that the slug found embedded in the wall of defendant's store was fired by defendant's .38 caliber revolver; that the weapon would not have fired unless the trigger was pulled.

Johnson's widow testified that she and her husband lived in an apartment directly above the store; she last saw him alive about 7:30 p.m. when he was downstairs in the store putting stock away; the cash register drawer was then not out on the counter. A part-time employee, called to the store by the widow shortly after the shooting, noticed that the cash register drawer was on the counter, and stated that he had never seen this happen before; he also noticed the number of a generator written on the order pad (on the counter) belonging to a type that fitted 1942 to 1947 Chrysler products.

There was evidence tending to establish "diminished capacity." Although defendant's girl friend stated that he was not drunk upon arrival at her home early on the morning of August 12, she did testify that she was with him the previous afternoon when he drank one quart of beer and wanted to take her to Lancaster. Robert Bowen was with defendant before the latter saw his girl friend later that afternoon; according to him defendant consumed four to five quarts of

beer during their four hour visit. Defendant's brother (David) last saw defendant at 6 p.m., about two hours before the offense was committed at which time defendant was drunk; he testified that defendant had the mind of a ten-year-old child. Another witness corroborated the testimony of Robert Bowen that defendant consumed four to five quarts of beer; she testified that he was drunk and nearly fell out of his car when he drove away.

Dr. George Thompson, court-appointed psychiatrist, conducted extensive tests and examination with a view to ascertaining defendant's mental capacities; he reached the following conclusions: Defendant suffers from a mental deficiency of the upper moron level, with an overall intelligence quotient of 69—his mental age was considered to be about 10 years; because he suffers from chronic mental deterioration, he is more subject to the effect of alcohol than a person without such impairment—defendant told the witness that he had no recollection of the shooting; defendant ''was probably sane at the time of the commission of the offense'' although ''his mental state was probably clouded by the alcohol he had consumed''; defendant probably had the mental capacity to form the specific intent to commit the crime of robbery but it was doubtful whether he had the mental capacity to deliberate, premeditate or to harbor malice—''he had diminished capacity to form specific intent to kill and to steal because of limited intellectual functioning and poor impulse control.''

With one exception (presently to be noted), the trial court generally followed the suggested form of instructions found in *People* v. *Conley*, 64 Cal.2d 310, 324-326 (fn. 4) [49 Cal. Rptr. 815, 411 P.2d 911]. In addition to defining homicide and robbery, the court gave the following instructions designated as ''Adaptation of *Conley* Rule.''[1] No instruction was

---

[1] ''Bearing on the matter of intent, the defendant has offered evidence of intoxication and mental deficiency.

''If you find that the defendant fired the shot which killed Mr. Johnson and was conscious at the time, but that he had substantially reduced mental capacity because of mental deficiency or intoxication, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form the specific mental state which is an essential element of murder under the felony murder doctrine or of manslaughter. I have already discussed the felony murder doctrine to some extent and will enlarge upon it shortly, as well as defining manslaughter for you.

''Malice is an essential element of murder, as I have previously informed you. Under the felony murder doctrine, malice is implied when a killing is a direct causal result of the perpetration of or the attempt to perpetrate certain felonies inherently dangerous to human life, including robbery.

''Therefore, if you find beyond a reasonable doubt that the defendant

given on second degree murder, which appellant claims constituted prejudicial error. Preliminarily, and prior to instructing the jury, the court told counsel in chambers that "In respect to the Wells, Gorshen, Connelly [*sic*] and other leading cases, the Court has prepared its own special instruc-

---

killed Mr. Johnson, whether intentionally, unintentionally, or accidentally, in the perpetration of or the attempt to perpetrate robbery, you will find him guilty of murder in the first degree.

"However, you will recall that one essential element of robbery is the specific intent to steal. Therefore, if you find that by reason of diminished capacity defendant did not form the specific intent to steal, or have a reasonable doubt whether he formed that spcific intent, you are in effect finding that he did not harbor malice, and you cannot find him guilty of a greater offense than manslaughter.

"Manslaughter is the unlawful killing of a human being without malice. Two kinds of manslaughter, the definitions of which are pertinent here, are voluntary manslaughter and involuntary manslaughter.

"*Voluntary manslaughter* is an intentional killing in which the law, recognizing human frailty, permits the defendant to establish the lack of malice either by:

"(a) Showing provocation such as to rouse the reasonable man to heat of passion or sudden quarrel. When such provocation is shown, the law will assume that the defendant who acts in the heat of passion or sudden quarrel, acts without malice. Or by:

"(b) Showing that due to diminished capacity caused by mental illness, mental defect, or intoxication, the defendant did not attain the mental state constituting malice.

"Thus, if you find that defendant did not, or you have a reasonable doubt that he did, commit robbery or attempted robbery, but find that he killed Mr. Johnson intentionally although in the heat of passion or a sudden quarrel, his killing would be without malice and would be voluntary manslaughter.

"If you find that due to diminished capacity he did not attain, or you have a reasonable doubt that he attained, the mental state constituting malice, but that he had the capacity to form the intent to kill and killed Mr. Johnson intentionally, the killing would also be voluntary manslaughter.

"*Involuntary manslaughter* is a killing in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner, or without due care and circumspection.

"Drawing or exhibiting a firearm in a rude, angry or threatening manner, in the presence of another person, except in self-defense, is an unlawful act not amounting to a felony, and if death results, such killing is involuntary manslaughter.

"The carrying of a firearm, even loaded, is without more a lawful act. Yet if the firearm is handled without due care and circumspection, death may result, and such killing would be involuntary manslaughter.

"If you find that by reason of intoxication, the defendant was unable to form either the specific intent to kill or that to steal (and thus, as I have explained, could not harbor malice) the killing of Mr. Johnson would nevertheless be involuntary manslaughter, even if the defendant was so intoxicated that he became unconscious. The law does not permit a person to use his own vice as a shelter against the legal consequences of his act. An ordinary and prudent man would not, while in the possession of a loaded firearm, permit himself to reach such a state of intoxication as to be unconscious of his actions."

tion adapted from the footnote in People versus Connelly-[*sic*] . . . The court feels that there is no possible tenable theory on which this could be a second degree murder since there is no substantial evidence under any other theory for second degree murder and that if diminished capacity reduces defendant's ability to form the various specific intents that may be material, it would be reduced all the way to voluntary or involuntary manslaughter, as the case may be.''

■ We agree with the trial court's analysis of the problem. A homicide committed in the perpetration of a robbery is murder of the first degree. (Pen. Code, § 189; *People* v. *Lookadoo,* 66 Cal.2d 307, 314 [57 Cal.Rptr. 608, 425 P.2d 208].) On the other hand, the nature and extent of the felony-second-degree murder rule in this state have been thus expressed: ''A homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (*other than the six felonies enumerated in Pen. Code, § 189*) constitutes at least second degree murder.'' (Italics added; *People* v. *Ford,* 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892].) Section 189 has been construed as not requiring a strict causal relation between the felony and the homicide, and the homicide is committed in the perpetration of a felony if the killing and the felony are parts of one continuous transaction. (*People* v *Mason,* 54 Cal.2d 164, 168-169 [4 Cal.Rptr. 841, 351 P.2d 1025].) In the present case defendant was seen leaving the store with a gun in his hand after the sound of a shot apparently originating within those premises. He carried a generator box which was found near his car and bore his fingerprints. When found, the victim's wallet was empty although he always carried a sum of money; too, the cash box on the store counter was empty. The bullet embedded in the wall of the store was fired by defendant's revolver, and there was evidence that the weapon could not have been discharged accidentally.

As noted above, the form of instructions suggested in *Conley* included an instruction on second degree murder;[2] but, as pointed out in the first paragraph of the footnote (fn. 4, 64 Cal.2d at p. 324), the suggested instructions are for cases where diminished capacity is a defense *and* ''the felony murder doctrine is not involved. . . .'' ■ Under the ''felony

---

[2]The suggested instruction on second degree murder read as follows: ''If you find, however, that the defendant's mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, premeditate, deliberate, or form an intent to kill, you will find the murder to be of the second degree.'' (64 Cal.2d at p. 325, fn. 4.)

murder doctrine'' a killing whether intentional or unintentional is murder in the first degree if committed in the perpetration or attempt to perpetrate six designated felonies, including robbery. (*People* v. *Coefield,* 37 Cal.2d 865, 868 [236 P.2d 570].) The ordinary elements of first degree murder—malice and premeditation—are eliminated by the doctrine, the only criminal intent required being the specific intent to commit the felony. ▉ As shown in *Coefield,* ''when one enters a place with a deadly weapon for the purpose of committing robbery, malice is shown by the nature of the attempted crime, and the law fixes upon the offender the intent which makes any killing in the perpetration of or attempt to perpetrate the robbery a murder in the first degree.'' (37 Cal.2d at p. 868.)

▉ But, says defendant, if there was no specific intent to commit robbery at the time of the killing or if the intent to take the generator was formed after the killing, the jury could have found him guilty of murder in the second degree. As noted above, specific intent to commit the independent felony must be proved in order to establish first degree murder; but as also noted earlier, proof of a strict causal relationship between a felony and a homicide is not required, and it is sufficient to show that the felony and the homicide were parts of a continuous transaction. (*People* v. *Mitchell,* 61 Cal.2d 353, 361-362 [38 Cal.Rptr. 726, 392 P.2d 526].) Too, subsequent possession of the victim's property (in this case, the generator box) is evidence that the independent felony was committed. (*People* v. *Cavanaugh,* 44 Cal.2d 252, 266 [282 P.2d 53].) The jury was properly instructed that if by reason of diminished capacity defendant did not form the specific intent to steal or if there was a reasonable doubt whether he formed such intent, he could not be found guilty of a greater offense than manslaughter; the finding, of course, was against defendant in such respects.

Appellant's present contention is further weakened by what may well be characterized as a tactical maneuver on the part of defendant's trial counsel to confront the jury with the limited choice between first degree murder and manslaughter in the event an acquittal was not secured. Thus, the record reveals that at the conclusion of the session in chambers regarding the instructions to be given, the court stated: ''If there are no further matters, Gentlemen, then I am ready to proceed if you are,'' to which defense counsel replied: ''I have nothing to add, your Honor.'' Assuming, *arguendo,* that

an instruction on second degree murder should have been given, the failure to request such an instruction may well be considered as invited error. (See *People* v. *Phillips,* 64 Cal.2d 574, 580-581, fn. 4 [51 Cal.Rptr. 225, 414 P.2d 353].)

Appellant argues that a reversal is warranted because of the incompetency of trial counsel, the following examples of which are failure to (1) ask for a second degree murder instruction; (2) move that the entire jury panel be excused after the prosecution had asked jurors prejudicial questions on *voir dire*; (3) ask for a mistrial when references were made to defendant's prior record; (4) call a defense witness who allegedly would have supported the theories urged by him; and (5) move for a mistrial when a certain witness was not called by the prosecution.

To justify relief on the ground that counsel was inadequate, it must appear that the trial was reduced to a farce or sham through the attorney's lack of competence, diligence, or knowledge of law. (*People* v. *Ibarra,* 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) Further, " [d]efendant has the burden . . . of establishing his allegation of inadequate representation 'not as a matter of speculation but as a demonstrable reality.' " (*People* v. *Reeves,* 64 Cal.2d 766, 774 [51 Cal.Rptr. 691, 415 P.2d 35].) Appellant has failed to sustain his burden; further, the record does not admit the application of the rule announced in *Ibarra.*

We have already disposed of example (1), *supra,* thus, we consider (2) that the entire panel should have been excused on motion, the ground for which seems to be that without objection by defense counsel the prosecution continued, despite some admonition at the bench, to so question each prospective juror that a death penalty minded jury would be impaneled. The questions related to the jurors' possession of any conscientious objections to capital punishment and whether the possible fact of a death penalty would prevent them from returning a first degree murder verdict. Such line of inquiry was not improper under the *Witherspoon* case (*Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 785, fn. 21, 88 S.Ct. 1770]) : "The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." The remaining examples [(3), (4) and (5)], we

believe, involve matters of trial tactics. In this regard, ''The choice of when to object and when to allow the evidence to come in as offered is inherently a matter of trial tactics. Ordinarily the tactical decisions of trial counsel will not be reviewed with the hindsight of an appellate court. [Citations.]'' (*People* v. *Garrison,* 246 Cal.App.2d 343, 350-351 [54 Cal.Rptr. 731].) The three items, numbered above, constitute no exception to the general rule just related. Significant, also, is this appraisal by the trial court of counsel's efforts: ''I think this matter was most ably tried by defense counsel. There was great consideration given to every legal point involved, including the voir dire proceedings . . . the instructions given . . . the admissibility of evidence. I think counsel did a most exemplary job in all respects. . . .''

The *Witherspoon* case is cited in support of defendant's last point. Conceding that such decision is not applicable when the jury chooses the penalty of life imprisonment, defendant nevertheless contends that he was denied due process because there were no death penalty objectors among the jurors finally selected. He refers to a certain study cited in *Witherspoon* (20 L.Ed.2d 776, 782 [fn. 10]) that jurors with no scruples against the death penalty are ''more prosecution prone'' than those who object to that penalty. But the court thus commented on the results of the study: ''The data adduced by the petitioner . . . are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction.'' (P. 782.)

The judgment is affirmed.

Fourt, Acting P. J., and Thompson, J., concurred.