[No. B069312. Second Dist., Div. Three. Oct. 28, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
PEOU POCK, Defendant and Appellant.

**COUNSEL**

Anthony J. Dain, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey, Paul M. Roadarmel, Jr., and Sanjay T. Kumar, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

### HAHN, J.*—

#### PROCEDURAL HISTORY

By an information filed September 7, 1990, appellant and codefendants Phy Chhem, Cheng James Chhem, and David Tam Oum were charged in 12 counts involving murder, robbery, burglary, and forcible rape. After arraignment and entry of plea, appellant's trial was severed from that of his three codefendants. Appellant's motion for appointment of cocounsel pursuant to Penal Code section 987.2 was granted.[1]

On March 4, 1992, a second amended information was filed naming only appellant. Appellant was charged with one count of murder (count 1) in violation of section 187, subdivision (a), eight counts of first degree residential robbery (counts 2-8 and 11) in violation of section 211, one count of forcible rape while acting in concert (count 9) in violation of section 264.1, and one count of oral copulation by acting in concert with force (count 10) in violation of section 288a, subdivision (d). As to all 11 counts it was alleged that appellant personally used a firearm within the meaning of section 12022.5 or 12022.3, subdivision (a), as to counts 9 and 10, and that a principal was armed with a firearm within the meaning of section 12022, subdivision (a)(1). As to count 1 it was also alleged that the murder was committed while appellant was engaged in the crime of robbery within the meaning of section 190.2, subdivision (a)(17). Appellant reentered a not guilty plea and denied the special allegations.

A trial by jury was begun. During the People's case-in-chief, appellant personally withdrew his not guilty plea to counts 9, 10, and 11, and entered a plea of guilty as charged in those counts. Appellant also admitted the firearm use and principal armed allegations in those counts. The trial court ruled that no evidence pertaining to those counts would be admitted in the People's case-in-chief in the guilt phase of the remaining counts.

---

*Judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.

[1]All further references to code sections refer to the Penal Code unless otherwise noted.

Appellant was found guilty as charged in counts 1, 2, and 4-8, with offenses in those counts being found to have been in the first degree. In count 3, the jury found appellant guilty of attempted robbery of the first degree, a lesser included offense of that charged. All firearm use and principal armed allegations were found true. The jury further found the special circumstance allegation in count 1 to be true.

After a penalty phase as to count 1, the jury fixed the penalty at life imprisonment without the possibility of parole.

At sentencing, the trial court imposed a total determinate term of 45 years and 4 months. Appellant was sentenced on count 1 to the term prescribed by law of life imprisonment without the possibility of parole, to run consecutive to the determinate term. Appellant received credit for 1,026 days including conduct credit.

Appellant filed a timely notice of appeal.

### FACTUAL BACKGROUND

In accordance with the usual rules of appellate review (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), the evidence at trial was as follows.

1. *Counts 4 and 5.*

On July 4, 1990, about 2 p.m., Naly Chum was visiting her sister, Soma Sak, at 1335½ St. Louis Street. The front door was closed, but not locked.

Five men, including appellant, came in. All of the men had guns. Appellant pointed his gun at both Ms. Chum and Ms. Sak. He said to be quiet and not scream.

Appellant asked if Ms. Sak had any money or if she had anything to take off. Ms. Sak removed things and gave appellant money.

Appellant told Ms. Chum, " 'If you don't give me things, then I'm going to shoot you and kill you.' " He had her take off and give him her bracelet.

Ms. Chum and Ms. Sak were tied up with telephone cord.

Sang Chum, Naly Chum's husband, had been to Trak Auto obtaining a part for his cousin's car. When he returned to the house he saw the doors closed and curtains closed on the windows.

Mr. Chum knocked on the door. Appellant pulled him in the door, and shoved him to the floor. Appellant had a gun. He pulled out Mr. Chum's wallet, and asked if Mr. Chum had some jewelry or something else. Mr. Chum answered that he did not.

Appellant told Mr. Chum to stay facedown on the floor, which he did. Mr. Chum was tied up with telephone cord.

2. *Counts 6 and 7.*

On July 9, 1990, Long Ly was at home at 2701 East 14th Street in Long Beach. With Ms. Ly were her parents, three sisters, a nephew, and a brother.

Around 10 a.m. four men, including appellant, came into the house through an unlocked screen door. Two men, one of whom was appellant, had guns. The first man with a gun told everyone to get on the floor and not do anything. Everyone did as ordered.

Chheng Ly had been eating cereal when a man pointed a gun at her and made her come to where the others were in the house. Upon doing so she saw there were four men, including appellant. Appellant pointed a gun at her and told her to take off her necklace. Ms. Ly did as instructed while appellant told her, " 'Be careful, be careful, you could die.' "

Three of the men, including appellant, began searching the house. Around 10:30 a.m. Yoon Puma came into the house, having completed watering plants in the backyard. She saw three men searching the house.

Appellant saw Ms. Puma's necklace and took it. He told her to be quiet, and tied her up with telephone cord. He advised her that if she moved he would shoot.

Appellant asked where the money and jewelry were. He said, " 'If you don't bring out all of the money, all the jewelry, I'll beat you up right now.' " Appellant also warned the whole family, " 'If you don't bring out everything you have, we'll kill you, one by one.' "

One man ripped out the telephone line. Another man, Jimmy Chhem, demanded Long Ly's gold bracelet and necklace which she gave to him. Ms. Ly was tied up with a rope or string and then covered with a blanket.

3. *Count 8.*

On July 10, 1990, around 2 p.m., Ngor Chirk was at home at 1230 Wesley in Long Beach. With her at home were her five children, ages two to eight.

They were watching television. The front door was closed, but the lock was broken. Four men, including appellant, pushed their way through the front door. All the men had guns.

Appellant grabbed the telephone. He said, " 'Don't, don't scream, be quiet. If you scream we're going to shoot you all dead.' " He also told Ms. Chirk not to let any of her children cry out or he would kill all of them.

Appellant grabbed Ms. Chirk and said, " 'Where do you have your money.' " He had his gun pointed at her forehead between the eyes.

Appellant went into Ms. Chirk's room and started searching. He removed an ounce of her gold, three rings and two necklaces. All four men were searching and taking things.

All the windows in the house were closed. Ms. Chirk was made to sit on the sofa. Appellant put a blanket over her. He said, " 'While I'm looking, you stay here quietly. Don't get up.' "

The men looked around for a long time. They messed up everything. Finally, three of the men, including appellant, left. One man with a gun remained in the house. He kept the gun pointed at Ms. Chirk while she took care of her children.

Later, Ms. Chirk heard shots fired. She lived next door to the Soks' residence. The man with the gun ran to the door. Ms. Chirk ran out to a neighbor's house to use the telephone. She saw all four men run away.

4. *Counts 1, 2, and 3.*

On July 10, 1990, Salim Sok was at home with her husband, Sina Sok. Srey Svay and her husband, Sen Mean, along with their children, had come to visit the Soks.

Sometime after 2 p.m. three men, including appellant, came into the house through the back door and kitchen. Appellant had two guns, one in each hand. Appellant ordered Ms. Sok into the living room from the kitchen.

Appellant said, " 'All of you don't move. If you move, I am going to kill you all.' " Everyone was told to sit down or get down.

Appellant made Sina Sok take off his bracelet. He was told to throw it down and complied. Appellant pointed a gun at Ms. Svay and said, " 'And you take off your bracelet also.' " She was told to put the bracelet on the floor.

Appellant pointed a gun at Sodavy Mean, and told her to take off her necklace. She was wearing two necklaces. She removed the first necklace, but was having trouble taking off the second one. Appellant said, " 'Hurry up and get that off[.]' "

Appellant then asked for and got a pillow from the sofa. He said the pillow was there so there would be no sound when he shot. He put the pillow to Sodavy Mean's neck.

Ms. Mean's father, Sen Mean, started to get up and come forward. Appellant shot Mr. Mean in the upper chest area below the shoulder. Mr. Mean walked forward, but appellant pushed him back and shot him in the stomach area from about three and one-half feet away.

Ms. Svay got up and put her arms around her husband, holding him on one side. She heard other shots, but did not know from which direction they came. The two other men who had been with appellant came from a bedroom. One of the men fired shots, one of which hit Mr. Mean in the left shoulder.

Mr. Mean began to fall and both he and Ms. Svay fell down. Ms. Svay did not see where appellant went. Sodavy Mean saw everyone running.

Long Beach Police Detective Logan Wren arrived at 1228 Wesley in Long Beach after 2 p.m. on July 10. In the house he found four expended cartridge casings and an expended piece of lead consistent with an expended bullet. The four casings were found on a bed, in a hallway, in a corner of the living room, and in the living room. A mark on a file cabinet on the south wall of the living room was consistent with having been hit by a bullet.

Los Angeles County Deputy Sheriff Edward Robinson examined the four casings found in the house. They were all .380 automatic caliber. Beyond that, none of the casings had sufficient identification characteristics to allow a determination as to whether they had been fired from one firearm.

On July 20, 1990, Long Beach Police Sergeant Tyrone Hatfield participated in the arrest of appellant in front of 1148 Orange. Appellant was coming from a parked car, and was walking to 1148.

In the parked car were two pair of latex gloves. At the station, in a booking search, $352 in United States currency was found on appellant's person. At 1148 Orange, No. 4, Sergeant Hatfield observed items of jewelry, stereo equipment, videocassette recorders and televisions which were recovered.

Detective Wren interviewed appellant after advising him and obtaining a waiver of his constitutional rights. They had a conversation about the robbery and murder of July 10, 1990. The interview was tape-recorded.[2] Los Angeles County Deputy Medical Examiner Solomon Riley performed an autopsy on Mr. Mean. Dr. Riley concluded that Mr. Mean died as a result of having received multiple gunshot wounds.

Dr. Riley found four gunshot entry wounds: one to the left side of the neck at the collarbone, one to the left shoulder, one to the right side of the front chest which went through the heart, and one to the right side which was a flesh wound.

The wound to the chest would, in and of itself, have been more rapidly fatal than the other wounds. All four wounds contributed to death.

Dr. Irving Root, a pathologist, testified that he had examined the autopsy report, photographs, and police reports. With respect to the four gunshot wounds, there was no way to determine the order in which they were inflicted.

The wound to the right chest wall, which went into and out of the heart, Dr. Root would expect to be fatal, and quite rapidly so. Dr. Root would expect a person could survive this wound for less than a few minutes.

None of the other three wounds would have been fatal with reasonable medical treatment. Dr. Root could not think of any significant way the other three wounds would have contributed to Mr. Mean's death.

Dr. Root would not have expected any of the other three wounds to cause a person to fall to the ground. The person would remain mobile.

With respect to the fatal wound, Dr. Root would anticipate a person could remain mobile for from 8 to 12 seconds, although it was conceivable that a person could be mobile for up to 30 or 60 seconds.

## ISSUES

Appellant argues that the trial court erred in giving a modified version of CALJIC No. 3.41 relating to proximate cause and the special circumstance alleged, and the trial court erred in imposing a full consecutive sentence on count 10.

---

[2]The tape was played for the jury. Among other things, appellant admitted that he had fired his gun four times.

## DISCUSSION

1. *The instructions defining the term actual killer as it related to the special circumstance.*

Close to the end of evidence in the guilt phase of the trial, the trial court and counsel discussed the proposed jury instructions. At the outset, the prosecutor advised the court that she would propose a modified version of CALJIC No. 3.41, dealing with proximate cause, in order to define the term "actual killer" as it related to the special circumstance alleged and the need to find intent to kill. It was the position of the prosecution that the actions of appellant, no matter which bullet was the fatal one, placed him in the position of being a person who did not require specific intent to kill.

The defense argued that the facts did not fit CALJIC No. 3.41, and that appellant had to be found the actual cause of the victim's death before no intent to kill would be required. Appellant's counsel did not believe there was sufficient evidence that he had been a "substantial factor" in the death of Mr. Mean.

At a later point, both the prosecution and defense agreed that appellant's role in the underlying felony was not that of an aider and abettor, and agreed that aiding and abetting instructions need not be given. It was agreed that for purposes of the special circumstance finding, however, an instruction would have to be given as to the requisite elements for that finding if the jury found appellant to be the actual killer, if they found he was not the actual killer, or if they were unable to make that determination. Both counsel then agreed to the modified version of CALJIC No. 8.80.1 which was given to the jury.

After discussion of other instructions the topic of proximate cause arose again. The trial court agreed with the prosecution that proximate cause was not an issue as to the charge of murder because the theory was felony murder. The defense also agreed with this proposition.

The trial court next indicated that it would give the prosecution's modified version of CALJIC No. 3.41 as it related to the special circumstance.

At the next hearing, the prosecution brought the completed set of instructions relating to proximate cause. Appellant's counsel at this point indicated the wording was "probably acceptable."

The jury, as part of the instructions pertaining to the special circumstance alleged, was instructed first: "The term actual killer is defined as follows:

Any person whose conduct proximately causes the death of another is an actual killer." The jury was then given CALJIC No. 3.41 as follows: "There may be more than one proximate cause of the crime of murder. When the conduct of two or more persons contributes concurrently as a proximate cause of the death the conduct of each is a proximate cause of the murder if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the moment of the murder and acted with another cause to produce the death. [¶] If you find that the defendant's conduct was a proximate cause of death to another person, then it is no defense that the conduct of some other person contributed to the death."

Appellant urges error occurred for several reasons with respect to the giving of CALJIC No. 3.41. He claims the error necessitates the reversal of the special circumstance finding.

The ultimate resolution of the issue raised has its basis in *Tison* v. *Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127, 107 S.Ct. 1676]. In *Tison*, the Supreme Court further explained its prior holding in *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368], which required a person convicted of murder to be found to have had an intent to kill in order to be considered eligible for death penalty consideration.

In *Tison*, the Supreme Court recognized that some nonintentional murders may be among "the most dangerous and inhumane of all[.]" (*Tison* v. *Arizona, supra,* 481 U.S. at p. 157 [95 L.Ed.2d at p. 144].) Persons who engage in criminal activity which shows a reckless indifference to the value of human life were deemed to be every bit as culpable in a "moral sense" as those who kill with an intent to kill. (*Ibid.*) Thus, the actual killer in such a case would be eligible for death penalty consideration without regard to a finding of actual intent to kill.

*Tison* also recognized that an aider and abettor in certain factual situations might be eligible for the death penalty without a finding of intent to kill. Thus, the court held that "major participation" in the felony committed, combined with "reckless indifference to human life," is sufficient to satisfy the culpability requirements for the death penalty. (481 U.S. at p. 158 [95 L.Ed.2d at pp. 144-145].) In *Tison*, the court pointed out that the Tisons had been actively involved in every element of the kidnap and robbery, and were physically present during the entire sequence of criminal activity culminating in the murder which was actually perpetrated by one person. These facts established major participation in the underlying felony with a showing of reckless indifference to human life. (*Ibid.*)

The courts of this state have adopted the principles enunciated in *Tison*. (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1138 [240 Cal.Rptr. 585, 742

P.2d 1306].) ▇ Thus, it has generally been recognized that intent to kill is not required for the "actual killer" in a case involving a felony-murder based special circumstance. Where a special circumstance is based upon one of the requisite felony-murder provisions, intent to kill need not be established as long as there is proof beyond a reasonable doubt that the person killed the victim in furtherance of the felony. (*People* v. *Jennings* (1988) 46 Cal.3d 963, 979 [251 Cal.Rptr. 278, 760 P.2d 475], cert. den. (1989) 489 U.S. 1091 [103 L.Ed.2d 862, 109 S.Ct. 1559].)

Furthermore, on June 5, 1990, as part of Proposition 115, the voters of this state adopted the *Tison* rationale which is now embodied in section 190.2, subdivision (d). Thus, both under the Constitution and by statute, it is recognized that certain classifications of persons who are not actual killers may be properly subject to special circumstances findings without the need to prove intent to kill.

▇ In the instant case the trial court was called upon to fashion an instruction dealing with a situation wherein a person might have actually fired the fatal shot or might have participated in all major events, not as an aider and abettor, but as an actual participant who, if he did not fire the fatal shot, certainly was responsible for instigating the firing of the fatal shot.

In this regard, it is instructive to examine the law with respect to vicarious liability and murder. ▇ It is settled law that when a defendant or his accomplice, with a conscious disregard for life, intentionally commits an act that is likely to cause death, and the victim or a police officer kills in reasonable response to such an act, the defendant is guilty of murder just as if he had been the actual killer. (*People* v. *Superior Court* (*Bennett*) (1990) 223 Cal.App.3d 1166, 1172 [273 Cal.Rptr. 71].)

In making this kind of an analysis, the life-threatening act which is the basis for such liability must be something beyond the underlying felony itself and must be a " 'proximate cause of death.' " (223 Cal.App.3d at p. 1172.) To be considered a proximate cause of death, the acts of the defendant must have been a "substantial factor" contributing to the result. (*Id.*, at p. 1173.) Finally, it has also been noted that in cases wherein more than one cofelon acts in concert, the extent of an individual's contribution to the resulting death need not be "minutely determined." (*Ibid.*)

▇ The instruction given by the trial court in the instant case, given the unique facts present, adequately informed the jury of the applicable law on liability with respect to a special circumstance finding. Such liability was fully consistent with the holding in *Tison*. Appellant's culpability clearly

falls within the range of persons established in *Tison* who do not need a separate finding of intent to kill, those persons ranging from the actual killer to a major participant in the felony who acts with reckless indifference to human life. It should be remembered that one of the examples of a nonintentional murderer whose act is as morally shocking as a person who kills with the intent to kill was "the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property." (*Tison* v. *Arizona, supra,* 481 U.S. at p. 157 [95 L.Ed.2d at p. 144].)

Appellant argues that in view of the California Supreme Court's disapproval of the wording of the proximate cause instruction in *Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041 [1 Cal.Rptr.2d 913, 819 P.2d 872] and *People* v. *Roberts* (1992) 2 Cal.4th 271 [6 Cal.Rptr.2d 276, 826 P.2d 274], cert. den. (1992) [121 L.Ed.2d 356, 113 S.Ct. 436] the instruction given in this case should be viewed as similarly erroneous.

In *Mitchell*, the Supreme Court determined that the language of then BAJI No. 3.75 improperly focused upon the cause that is spatially or temporally closest to the harm. In other words, there was an undue emphasis on nearness which could be remedied by substituting the " 'substantial factor' test." (*Mitchell* v. *Gonzales, supra,* 54 Cal.3d at p. 1052.)

In *Roberts*, the Supreme Court noted that the flaw in the wording of the proximate cause instruction would not be a detriment where there was no possible supervening cause. In such a case, the concern that the instruction might do away with foreseeability is not present. The key, the court explained, is the law in light of the evidence. (*People* v. *Roberts, supra,* 2 Cal.4th at pp. 312, 313, 321-322.)

As previously pointed out, it was appellant's role as the major participant in the felony as well as being an actual shooter of Mr. Mean which was the evidence before the jury. The defense focused upon argued misidentification as well as which wound might have been the fatal wound. Thus, even to the extent that there was some doubt as to whether appellant fired the actual fatal shot, the jury was properly instructed that, as under a vicarious liability theory, if appellant was substantial factor in the death of Mr. Mean, he would be liable as an actual killer. The evidence established that the second man fired his weapon only after coming from the bedroom in response to appellant's having shot Mr. Mean twice. The flaw in the wording of the proximate cause instruction discussed in *Mitchell* and *Roberts* did not apply to the facts of this case.

Appellant argues that even if CALJIC No. 3.41 was properly given, that CALJIC No. 3.40 should have been given sua sponte. CALJIC No. 3.40 instructs the jury that a cause of death is an act which sets in motion a chain of events which produces death as a natural and probable consequence of the act, and without which the death would not occur. The focus of the instruction is upon the act. However, in the instant case the issue was not whether an unforeseen supervening cause resulted in Mr. Mean's death. It was whether appellant's actions in connection with his participation in the underlying felony coupled with his shooting of Mr. Mean, whether fatal or not, operated as a substantial factor in Mr. Mean's death such that intent to kill was not required. CALJIC No. 3.40 was not applicable.

Appellant also complains that error occurred because, in connection with the issue of felony murder, separate from the special circumstance issue, the trial court gave CALJIC No. 8.55 sua sponte.

CALJIC No. 8.55 provides:

"To constitute murder there must be, in addition to the death of a human being, an unlawful act which was a proximate cause of that death.

"A proximate cause of a death is a cause which, in natural and continuous sequence, produces the death, and without which the death would not have occurred."

Appellant argues this instruction allowed the jury to conclude presumptively, and erroneously, with regard to the special circumstance, that because appellant was a participant in the robbery, he was automatically guilty of the murder as an actual killer.

Initially, with respect to felony murder, this instruction need not have been given. ▇▇ It is settled that with respect to the theory of felony murder, there is no strict causal relationship between the felony and the homicide. Rather, the focus is on the underlying felony, that is whether the felony has been completed, abandoned, stopped, or is ongoing. (*People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1016 [248 Cal.Rptr. 568, 755 P.2d 1017]; *People* v. *Mason* (1960) 54 Cal.2d 164, 168-169 [4 Cal.Rptr. 841, 351 P.2d 1025].)

However, appellant overstates the significance of the giving of this instruction. (5) In determining the effect of an instruction and any error, the charge in its entirety must be considered. (*People* v. *Warren* (1988) 45 Cal.3d 471, 487 [247 Cal.Rptr. 172, 754 P.2d 218].)

Initially, this instruction was given prior to the instructions concerning the special circumstance law. As such it was clear that any applicability related to the law dealing with felony murder, not special circumstances. This error, if it had any impact, served to benefit appellant because even though a death may be accidental, unintentional, or intentional in order to constitute felony murder when occurring during the commission of a requisite felony, this instruction erroneously told the jury the death must result from an unlawful act. If anything, the instruction could have erroneously restricted the necessary elements for first degree felony murder to the detriment of the People.

Secondly, the language of the second paragraph of CALJIC No. 8.55 is similar to language in CALJIC No. 3.40 which appellant argues should have been given sua sponte. As previously noted, however, because the issue of foreseeability or supervening act was not presented by the evidence, appellant could have suffered no prejudice even if the jury somehow applied CALJIC No. 8.55 to the special circumstance finding.

Finally, even if error did occur, it is inconceivable that appellant suffered prejudice under any standard. The evidence was uncontradicted that Mr. Mean's death occurred during the course of a robbery. Furthermore, appellant's statements and actions manifested a clear intent to kill if his directions were not followed. Because Mr. Mean's daughter was too slow in following directions to remove a necklace, appellant had obtained a pillow to muffle his shots. When Mr. Mean failed to follow instructions and moved, appellant shot him at least twice. There simply was no other inference available as to appellant's intent even if intent to kill was required, a point emphasized by the prosecution a number of times in closing arguments. (*Rose* v. *Clark* (1986) 478 U.S. 570, 583-584 [92 L.Ed.2d 460, 474-475, 106 S.Ct. 3101]; *People* v. *Guiton* (1993) 4 Cal.4th 1116, 1129-1130 [17 Cal.Rptr.2d 365, 847 P.2d 45].)

2. *Sentencing as to Count 10.*

Appellant argues that the trial court erred in sentencing him to a full consecutive sentence of nine years on count 10 because that was a sentencing choice under section 667.6, subdivision (c), which was not supported by a statement of reasons.

■ It is well settled that in making sentencing choices pursuant to section 667.6, subdivision (c), sexual assault offenses, the trial court must state a reason for imposing a consecutive sentence and a separate reason for imposing a full consecutive sentence as opposed to one-third the middle term as provided in section 1170.1. (*People* v. *Belmontes* (1983) 34 Cal.3d 335, 347 [193 Cal.Rptr. 882, 667 P.2d 686].)

In the instant case, as a reason for imposing consecutive sentences, immediately after imposing the first consecutive sentence as to count 9, the trial court noted the pattern of conduct engaged in by appellant, specifically the "crime spree" engaged in by appellant. Such a statement is clearly proper under California Rules of Court, rule 425(a)(3), and was supported by the evidence at trial. It is also true that a separate statement is not required for each consecutive sentence. (*People* v. *Ramirez* (1987) 189 Cal.App.3d 603, 635 [233 Cal.Rptr. 645]; *People* v. *Hetherington* (1984) 154 Cal.App.3d 1132, 1142 [201 Cal.Rptr. 756].)

In selecting a full consecutive sentence under count 10, the trial court relied upon the vicious and callous manner in which the victim was treated. Such a conclusion was supported by the testimony of the victim prior to appellant entering his plea to those counts. She testified that her clothing was cut off with scissors. Her hair was not cut, but only after she begged appellant and the others not to carry out their threat to cut off her hair. Her mouth was covered so that she could not cry. Her hands were tied during the sexual assaults. Appellant threatened to kill her if she called the police. These facts clearly rose above those necessary to commit the offense and supported the factor referred to by the trial court, and set forth in California Rules of Court, rule 421(a)(1).

The trial court fully complied with the requirement to state reasons as necessary for its sentencing choices, and those choices were fully supported by the record.

### DISPOSITION

The judgment is affirmed.

Klein, P. J., and Hinz, J., concurred.

Appellant's petition for review by the Supreme Court was denied Feburary 10, 1994.